[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11939
_____

D.C. Docket No. 1:15-cv-02266-KOB

RONALD HUNTER, JR.,

Plaintiff – Appellee,

versus

LEEDS, CITY OF, as a person under 42 U.S.C. § 1983,
BYRON JACKSON, Chief of Police, individually and in his official capacity,
ROBERT KIRK,
RON REAVES,
JOHN SHIELDS,
BRIAN CHALIAN,
Officers, each individually and in his official capacity,

Defendants – Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(November 1, 2019)

Before TJOFLAT, NEWSOM, and GILMAN,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, an armed individual, suspected of being involved in a shooting, was shot by a police officer at the conclusion of a four-car police chase. The suspect brought this action under 42 U.S.C. § 1983 against all the officers involved in the pursuit, claiming that the shooting constituted excessive force in violation of the Fourth Amendment;[1] he also raised various other state-law claims related to the shooting. The officers, in response, alleged that the force was justified because the suspect pointed his gun at the officer who shot him after being ordered to drop it, and alternatively that they are immune from suit under qualified immunity and Alabama's state-law discretionary-function immunity.

The officers moved for summary judgment on all counts on the grounds of qualified and state-law immunity. The District Court denied their motion in large part. They now appeal.[2] We affirm the District Court's decision with respect to the one officer who shot the suspect but reverse as to the remaining officers.

---

[*] Honorable Ronald Lee Gilman, United States Court of Appeals for the Sixth Circuit, sitting by designation.

[1] The Fourth Amendment provides in relevant part: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The Fourth Amendment's prohibition of unreasonable searches and seizures applies to the States and their political subdivisions under the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961).

[2] We have jurisdiction under 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28

2

I.

The events leading up to Ronald Hunter, Jr.'s Fourth Amendment claim stem from a domestic quarrel that turned violent. That episode occurred on December 16, 2013, in an apartment complex in the City of Leeds, Alabama, where Anthony Roberson and Tammy Miller (the latter being Roberson's wife and Hunter's daughter) lived. Hunter came to the residence in somewhat of a rage, armed with a gun. Hunter and Roberson argued, and the dispute escalated when Hunter drew his gun. Roberson, also armed, fired several shots at Hunter.

The Leeds Police Department received two 911 calls. The first caller screamed incessantly, and the only thing the 911 operator could make out was "Frisco Avenue." Officer Robert Kirk and Sergeant Ron Reaves were dispatched to the Frisco Avenue neighborhood but found nothing. The second call came about thirty minutes later. The caller said that a man was holding a child hostage at gunpoint at the Marlee Villa Apartments. Kirk and Reaves were again dispatched to the scene, along with Officer Brian Chalian. While en route, the dispatcher informed the officers that shots had been fired at the apartment, and that one of the men involved, Hunter, was sitting in his car, a yellow Monte Carlo, on Frisco Avenue in front of the apartment complex.

---

U.S.C. § 1291 notwithstanding the absence of a final judgment."); *Sheth v. Webster*, 145 F.3d 1231, 1237–38 (11th Cir. 1998) (per curiam) (holding that a district court's denial of Alabama state-law immunity under § 6–5–338(a) is immediately appealable).

When Kirk, Reaves, and Chalian arrived at the Marlee Villa Apartments, each in a separate patrol car, they found Hunter sitting in the Monte Carlo with the windows up. According to the officers, Kirk drew his gun and ordered Hunter to show his hands. Hunter did not comply. Hunter appeared to be yelling, but Kirk and Reaves couldn't make out what he was saying. While Hunter admits that he saw the police arrive, he denies seeing Kirk draw his gun or hearing any order to show his hands. He thought the officers had come to arrest Roberson for shooting at him, so he drove away, headed toward his home at 8101 Jackson Avenue.

Kirk, Reaves, and Chalian pursued him to his residence. The Chief of Police, Byron Jackson, was in his office when the second 911 call came. When he learned that Hunter had left the scene and that the three officers were pursuing him, he joined the chase.

There is some disagreement as to the nature of the chase. The officers maintain that Hunter sped, drove erratically and in the opposing lane, and ran a red light and a stop sign. Kirk claims that Hunter pointed a gun through his back window at Kirk's patrol car; he informed the other officers over the radio that he saw a gun in Hunter's hand. Hunter denies seeing or hearing the police following him, denies that he was driving recklessly, and denies ever pointing his gun or making it visible to anyone.

4

On arriving at his residence, Hunter parked in the carport behind the house. Kirk drove into the driveway and stopped short of the carport. He got out of his patrol car and ordered Hunter, who was sitting in the driver's seat, to show his hands. When Kirk observed Hunter looking down toward his lap, he repositioned himself behind a large tree near the carport, 20 to 25 feet away from Hunter's car. Again, he ordered Hunter to show his hands. Hunter failed to do so and, instead, shifted from the driver's seat of his car to the passenger's seat and opened the door. As he opened the door, Kirk claims Hunter turned and pointed his gun at Kirk, so Kirk fired.

By this time, Jackson had pulled into the driveway, parked his car, and taken a position alongside the house, using it for cover. He could see Kirk standing a few yards ahead behind the tree with his weapon drawn. A moment later, as Jackson approached the edge of the house, he saw Kirk shoot in Hunter's direction.

Reaves heard the first round of shots as he was getting out of his patrol car on Jackson Avenue—he had driven past Hunter's residence to cut off a potential escape route. Chalian also heard the shots while parking his patrol car on Moore Street, which ran alongside Hunter's residence.

Kirk fired "approximately three rounds." Hunter recoiled into his car and then reached back out for the door. According to Kirk, Hunter still had the gun in his hand, and he pointed it at Kirk again. Hunter denies that he pointed the gun at

5

Kirk; instead, he says he dropped the gun through the open door. Kirk, acting on his impression that Hunter had the gun in his hand, fired several more shots. A total of ten bullet casings, all matching Kirk's service weapon, were ultimately recovered from the scene.

At this point, Jackson had not changed his position; he was still behind the residence, using it for cover. Reaves, meanwhile, had moved toward Kirk. He heard Kirk tell Hunter to drop the gun, and then saw Kirk fire the second round of shots, but still could not see Hunter from where he was. Chalian was still on the other side of the house, between the house and Moore Street, when the second round of shots was fired.

After Kirk fired the second round of shots, Hunter fell back into his car. Jackson then approached the car on the passenger side, directing Kirk to cover him. He saw Hunter slumped in the passenger seat and a gun on the front transmission tunnel. He grabbed Hunter's right hand, pulled him out of the car, and told Reaves to call the paramedics. An ambulance arrived, and Hunter was taken to the hospital where he received medical care. Officer John Shields, who had been on duty elsewhere, came to the scene as Hunter was being placed in the ambulance.

Hunter disputes most of the officers' descriptions of the shooting. He claims that he tried to open his driver-side door, but it was jammed, so he moved to the passenger side of the car. Once he opened the passenger door, he was shot in the

6

stomach.  He heard someone order him to throw out his gun, so he dropped it through the opening of the door.  When he opened the door wider to exit the vehicle, he "heard shots from several directions" and was "shot multiple times."  He denies that he ever pointed his gun at anyone while he was en route to his residence or after he arrived there.

On January 14, 2014, a complaint was filed in the Jefferson County Circuit Court alleging that "Ronald Hunter did, with intent to commit the crime of murder . . . attempt to intentionally cause the death of another person, Robert Kirk, by pointing a pistol at Peace Officer Robert Kirk."  A warrant issued for Hunter's arrest, and he was taken into custody.  On June 20, 2014, Hunter was indicted for attempted murder for "pointing a pistol at Peace Officer Robert Kirk."  In the interim, the Court had Hunter examined by a court-appointed psychiatrist to determine his competency to proceed and his mental state at the time of the offense.  He was found to be "overtly psychotic" and not competent to proceed.  The Court therefore committed him to the State Department of Mental Health for treatment.  Hunter was admitted to the Taylor Hardin Medical Facility on July 17, 2014, and on September 30, 2014, the Court, acting on the Facility's report, found him competent to stand trial for attempted murder.

In December 2015, while the prosecution was pending, Hunter brought this action against the officers involved in his apprehension,[3] and the City of Leeds, asserting the excessive-force claim now before us, as well as other federal and state-law claims.[4] On January 25, 2016, pursuant to a plea agreement, he pled guilty in the Circuit Court to the lesser-included offense of menacing.[5] Both the proposed plea agreement and the plea signed by the court indicate that Hunter pled guilty to "Att Murder reduced to Menacing."

---

[3] Hunter also sued Inspector Alan Holman, who was one of the officers dispatched pursuant to the second 911 call. The District Court dismissed Holman from the case because Hunter was unable to serve him with process.

[4] Hunter's complaint in this case contains nine counts. It fails to comply with the pleading requirements of Federal Rule of Civil Procedure 8(a) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), in that it is replete with conclusory allegations—both of fact and law. Moreover, it is a shotgun complaint in that each count subsequent to the first count incorporates by reference all previous allegations and counts. Putting aside these incorporations, we describe what each of the nine counts standing alone appears to claim. Three counts (I, III, and VI) seek relief against the defendant officers under 42 U.S.C. § 1983 for violations of the federal constitution. Count I alleges that the officers used excessive force in apprehending Hunter; Count III alleges that the officers not involved in the shooting were liable for the use of such force by failing to intervene; and Count VI alleges that, following Hunter's indictment for attempted murder, the officers denied him procedural due process of law. Six of the counts seek relief under state law. Counts II, "Assault and Battery," and IX, "Tort of Outrage," are brought against the officers. Counts IV, "Negligent Supervision," V, "Inadequate Training," VII, "Civil Conspiracy," and VIII, "Deliberate Indifference," are brought against the City of Leeds and Police Chief Jackson. The only claims presented in this appeal are those related to the shooting—Counts I, II, III, and IX.

[5] "A person commits the crime of menacing if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury." Ala. Code § 13A–6–23(a).

8

The officers jointly moved the District Court for summary judgment on two grounds.[6]  First, Hunter's plea of guilty to the offense of menacing estopped him from denying that he pointed his gun at Kirk and therefore Kirk's response was reasonable under the Fourth Amendment.  Second, and alternatively, Hunter's excessive-force claim could not be maintained because the officers were entitled to qualified and state-law immunity.  The District Court denied the motion in large part,[7] holding with respect to Hunter's Fourth Amendment claim that he was not estopped from denying that he pointed his gun at Kirk, and thus that the officers were not entitled to immunity.  The officers brought this interlocutory appeal contesting the District Court's denial of qualified immunity and state-law immunity from suit.[8]

## II.

Before we can decide whether the officers are entitled to qualified immunity based on their conduct, we must first determine what exactly that conduct was.[9]

---

[6] The Officers moved for summary judgment without answering Hunter's complaint. The District Court entertained and ruled on their motion notwithstanding the absence of an answer asserting, among other things, qualified immunity.

[7] The District Court granted the motion as to Shields's liability for the excessive force, failure to intervene, and assault and battery claims, since it was undisputed that Shields was not present when Hunter was shot.  Hunter did not cross-appeal this ruling.

[8] We review the denial of summary judgment based on qualified immunity *de novo*, viewing the facts in the light most favorable to the nonmovant.  *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015).

[9] In the course of deciding an interlocutory appeal from the denial of qualified immunity, we have authority to decide otherwise non-appealable matters if they are "inextricably intertwined with [the] appealable decision [on qualified immunity,] or if review of the former decision is necessary to ensure meaningful review of the latter."  *Smith v. LePage*, 834 F.3d

Although we must view the facts in the light most favorable to Hunter, as the non-moving party, the officers' primary argument on appeal is that the District Court erred in crediting Hunter's assertion that he never pointed his gun at Kirk or any of the officers. They argue that his guilty plea to menacing prevents him from relitigating whether he pointed his gun, on the ground of either judicial or collateral estoppel, or the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364 (1994). We conclude that collateral estoppel bars Hunter from asserting, contrary to his guilty plea, that he never pointed his gun at Kirk, but does not bar him from contesting Kirk's statements regarding the number of times that Hunter allegedly pointed his gun.

To determine the preclusive effect of an Alabama criminal judgment, we must apply Alabama law. *Brown v. City of Hialeah*, 30 F.3d 1433, 1437 (11th Cir. 1994). In Alabama, collateral estoppel bars parties from relitigating a previously decided issue where (1) the issue and the parties are the same in both cases, (2) the issue was "actually litigated" in the prior case, and (3) the resolution of that issue was "necessary to the prior judgment." *Leon C. Baker, P.C. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 821 So. 2d 158, 162–63 (Ala. 2001). The "same-parties" prong may be satisfied if the party seeking the benefit of collateral

---

1285, 1292 (11th Cir. 2016) (quoting *Jackson v. Humphrey*, 776 F.3d 1232, 1239 (11th Cir. 2015)).

10

estoppel is in privity with the party in the first suit, and the party to be estopped is bound by the previous judgment—i.e., was a party to the previous suit. *Wood v. Kesler*, 323 F.3d 872, 880 n.10 (11th Cir. 2003) (citing *Leon C. Baker*, 821 So. 2d at 165). Alabama's expansive definition of privity "includes not only a successive interest to the same property right, but also 'an identity of interest in the subject matter of [the] litigation.'" *Id.* (quoting *Leon C. Baker*, 821 So. 2d at 165).

Here, the defendant officers were not parties to the criminal proceeding against Hunter in state court, which culminated in Hunter's guilty plea. However, we find that the officers shared an "identity of interest" with the State, and thus are in privity with the State for purposes of this suit. Our decision in *Wood v. Kesler* is instructive.

In *Wood*, we found an "identity of interest" between the State, which prosecuted a criminal defendant, and the officer who arrested that defendant, in a § 1983 suit against the officer stemming from the arrest. 323 F.3d at 880 n.10. There, the defendant was cited for speeding 17 miles-per-hour over the speed limit and arrested for reckless driving. *Id.* at 875–76. A jury found him guilty of speeding, but not guilty of reckless driving. *Id.* at 876. He then sued the arresting officer under § 1983, claiming false arrest and malicious prosecution. *Id.* at 876–77. We held that the defendant's conviction for speeding collaterally estopped him, under Alabama law, from denying that he had been driving 17 miles-per-hour

11

over the speed limit in his § 1983 suit. *Id.* at 879. Although the arresting officer "was not a party in the prior case, [he] acted for the State in charging [the defendant] with speeding in the prior case and shares an identity of interest with the State in the subject matter of the litigation." *Id.* at 880 n.10. Thus, the arresting officer was in privity with the State, and the same-parties requirement was satisfied. *Id.*

Likewise here, the officers "acted for the State" in pursuing and apprehending Hunter, and the "subject matter of the litigation" is identical to the subject matter of Hunter's criminal prosecution. Hunter's guilty plea and conviction for menacing were based on his conduct during the officers' pursuit and apprehension of Hunter, and Hunter's present § 1983 claims all center on the officers' conduct during that same pursuit and apprehension. Under these circumstances, where the events that form the basis of each case are identical, the officers and the State share an identity of interest in the allocation of rights and liabilities arising from that single episode. The officers were acting for the State during the pursuit and apprehension that resulted in Hunter's prosecution, and they share an interest with the State in ensuring that Hunter is held responsible for his actions during that encounter. Thus, the same-parties requirement is satisfied.[10]

---

[10] We do not suggest that, as a matter of Alabama estoppel law, an arresting officer will always be in privity with the State such that he may use collateral estoppel to prevent an arrestee from litigating, in a subsequent civil suit, facts determined against him in a prior criminal

12

Additionally, the issue presented here—whether Hunter pointed his gun at Kirk—is identical to the issue presented, litigated, and decided in the Alabama criminal proceeding.  The District Court reasoned that this issue was not *necessarily* decided by his guilty plea, because the record failed to indicate what "physical action" he committed to "intentionally place[ ] or attempt[ ] to place another person in fear of imminent serious physical injury."  *See* Ala. Code § 13A–6–23(a).  Without a plea colloquy or other record evidence establishing the "physical action" taken by Hunter, the Court could not be sure that the basis for Hunter's menacing conviction was his pointing a gun at Kirk.

But both the warrant and the initial indictment charged Hunter solely with "pointing a pistol at Peace Officer Kirk," and no other action.  In Alabama, a guilty plea "is an admission of all facts sufficiently charged in the indictment," not just an admission to the crime in the abstract.  *G.E.G. v. State*, 54 So. 3d 949, 954 (Ala. 2010) (quoting *Scott v. State*, 917 So. 2d 159, 166 (Ala. Crim. App. 2005)).  Of course, here Hunter pled guilty not to the crime charged in the indictment (attempted murder), but to the lesser-included offense of menacing.  When a defendant enters a plea to a lesser-included offense, the indictment is implicitly amended to charge that lesser-included offense.  *Ex parte Cole*, 842 So. 2d 605,

---

judgment.  We hold merely that the State and the officers share an identity of interest under all the circumstances of this case, where the prior judgment and the current § 1983 claims both arose out of the same sequence of events involving the same individuals.

608 (Ala. 2002); *see* Ala. R. Crim. P. 13.2(c) ("Specification of an offense in an indictment or information shall constitute a charge of that offense and of all lesser offenses necessarily included therein.").

Nonetheless, the Alabama Rules of Criminal Procedure permit "*only* those amendments that charge a lesser-included offense," and defendants "cannot consent to an amendment that effectively charges an offense not contemplated by the indictment." *Ex parte Cole*, 842 So. 2d at 608 (emphasis added); *see* Ala. R. Crim. P. 13.5(a) (permitting amendment "except to change the offense or to charge new offenses not contemplated by the original indictment"). Because the only physical action charged in the indictment here was Hunter's pointing a pistol at Kirk, it could not have been amended under Alabama law—formally or functionally—to add a different physical action.[11] Thus, the basis for Hunter's guilty plea to menacing necessarily was his pointing a pistol at Kirk, and by pleading guilty Hunter has admitted to pointing his pistol at Kirk. Hunter is estopped from now claiming that he did not do so.[12]

---

[11] The District Court thus erred in concluding that the specific menacing act Hunter performed could have been something other than his pointing his pistol at Kirk. A separate act, not charged in the indictment, could not have supported Hunter's guilty plea to the lesser-included offense. The validity of his conviction thus implies that the "physical action" was Hunter's pointing his pistol at Kirk.

[12] Since we conclude that collateral estoppel bars this assertion, we do not reach the officers' claim that judicial estoppel also bars the assertion. Furthermore, the facts properly asserted—i.e., not barred by collateral estoppel—do not "necessarily imply the invalidity of [Hunter's] conviction." *See Heck*, 512 U.S. at 487, 114 S. Ct. at 2373. Because it is logically

14

However, our inquiry cannot end here, because Kirk claims that Hunter pointed his gun at him three separate times: once while driving, and twice at his house. Although Hunter's guilty plea to menacing constitutes an admission that he pointed his gun at Kirk, it cannot fairly be construed as an admission that he pointed his gun at Kirk all three times. The only fact *necessarily* decided by his guilty plea is that Hunter pointed his gun at Kirk (at least) once. The indictment upon which his guilty plea was based stated only that Hunter "attempt[ed] to intentionally cause the death of another person, Robert Kirk, *by pointing a pistol at Peace Officer Robert Kirk*," which could be based on a single act of gun-pointing, or three, or ten. Though Hunter cannot dispute that he did in fact point his gun at Kirk, it would not be inconsistent with his guilty plea to permit him to dispute *when* he pointed his gun, or whether he pointed his gun multiple times as Kirk claims. Therefore, while collateral estoppel prevents Hunter from denying simply that he ever pointed his gun at Kirk, it does not go so far as to prevent him from denying Kirk's claims that he pointed his weapon multiple times.

In sum, for purposes of our review on qualified immunity, we must assume that Hunter pointed his weapon at Kirk. But, viewing the other evidence in the light most favorable to Hunter, we must credit his assertions that he didn't point his

---

possible that Hunter pointed his gun at Kirk, and that Kirk nonetheless used excessive force in response, the *Heck* bar does not apply.

15

weapon more than once; that is, collateral estoppel only requires us to assume that Hunter pointed his weapon once. That leaves us with three possible factual scenarios, based on the three separate acts of gun-pointing alleged by Kirk:

1) Hunter pointed his weapon at Kirk through the back windshield of his vehicle while driving, but did not point his weapon at Kirk while at his residence.[13]

2) Hunter pointed his weapon at Kirk when he first arrived at his residence, just before Kirk fired his first round of shots. Under this scenario, when Hunter first arrived at his residence, he opened the passenger door of his car and pointed his weapon at Kirk, and Kirk fired three shots in response. Hunter then, after being shot and hearing an order to drop his gun, dropped his gun through the open car door. When he opened the door wider to get out, Kirk shot him several more times.

3) Hunter pointed his weapon at Kirk just before Kirk fired his *second* round of shots. Under this set of facts, Hunter did not point his weapon when he first arrived at his residence, but opened the passenger door and was shot immediately by Kirk. After being shot, he opened his door

---

[13] Although it is theoretically possible that the grand jury could have indicted Hunter for attempted murder based on this single act of gun-pointing, it seems highly unlikely that it would have based its indictment solely on this one action, given how the rest of the encounter between Hunter and the officers at the residence allegedly unfolded.

wider and *then* pointed his weapon at Kirk. Kirk then fired several additional rounds in response.

Ultimately, a jury must resolve the fact question regarding how many times Hunter pointed his weapon at Kirk and when. But for purposes of reviewing the District Court's denial of summary judgment, we must analyze the officers' entitlement to qualified immunity under the factual scenario that is most favorable to Hunter. That requires us to assume that the events of December 16, 2013, unfolded as outlined in the second factual scenario above—that Hunter pointed his weapon at Kirk upon arriving at his residence, Kirk fired three shots at Hunter in response, Hunter then dropped his weapon out of the open passenger door,[14] and Kirk nonetheless fired several more shots at Hunter—since that is the only version of events in which Hunter would have been shot while he was unarmed. Under the other scenarios, Hunter was either pointing his gun or, at the very least, was armed at the time he was shot. Therefore, the second scenario is the version of events that most favorably shows that Hunter is entitled to relief.[15]

---

[14] A legitimate factual dispute exists as to whether Hunter dropped his gun out of the car or, as Kirk claims, pointed his gun at Kirk, especially since the weapon was found inside Hunter's car and not on the ground outside the car where Hunter claims to have dropped it. However, at the summary judgment stage, we must resolve this factual dispute in Hunter's favor.

[15] We emphasize that these "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case," nor the facts that Hunter will ultimately be able to prove at trial. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)). Nevertheless, for purposes of summary judgment, we are not concerned with the facts that the parties might be able to prove,

17

III.

We now turn to the question of qualified immunity.  Qualified immunity protects a government official from being sued for damages under § 1983 unless preexisting law clearly establishes the unlawfulness of his actions, such that any reasonable official in his position would be on notice that his conduct was unlawful.  *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013).  In order to be entitled to qualified immunity, an official must first establish that he was acting within his discretionary authority when he engaged in the allegedly unlawful conduct.  *Id.*  The officers in this case were clearly performing discretionary functions when pursuing and apprehending Hunter in response to the 911 call.[16]  Thus, the burden shifts to Hunter to show that the officers violated his constitutional rights, and that those rights were clearly established at the time of the alleged misconduct.  *Id.* at 1281.  "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Corbitt v. Vickers*, 929 F.3d

---

but rather with whether the facts viewed in the light most favorable to Hunter show a violation of clearly established law.  *Id.*

[16] Although Hunter contests this point on appeal, his arguments are unavailing.  The pursuit and apprehension of suspected criminals is a core discretionary function of the police.  *See Crenshaw v. Lister*, 556 F.3d 1283, 1289–90 (11th Cir. 2009) (per curiam).  Moreover, Hunter did not contest this point in the District Court, and so we will not entertain his argument on appeal.  *See Sterling Fin. Inv. Grp., Inc. v. Hammer*, 393 F.3d 1223, 1226 (11th Cir. 2004) ([A]rguments not presented in the district court will not be considered for the first time on appeal.").

18

1304, 1311 (11th Cir. 2019) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).

A plaintiff can show that his constitutional rights were clearly established in any one of three ways.  First, he can point to a materially similar case decided by the Supreme Court, this Court, or the highest court of the relevant state that clearly establishes the unlawfulness of the police conduct.  *Morton*, 707 F.3d at 1282.  Second, even in the absence of such precedent, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts in [his] situation," *id.* (alterations in original) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)), provided that the principle gives the officer "reasonable warning that the conduct at issue violated constitutional rights," *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S. Ct. 2508, 2516 (2002).  Third, a plaintiff can show that the conduct at issue "lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law."  *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002).

In this case, Hunter claims that the officers violated his clearly established Fourth Amendment right not to be subjected to excessive force.  Viewing the evidence in the light most favorable to Hunter and drawing all reasonable inferences in his favor, we find that there is a genuine factual dispute as to whether

19

Kirk unconstitutionally subjected Hunter to excessive force in violation of clearly established law, but there is no dispute that the other officers did not.

### A.

The use of deadly force by the police is a seizure subject to the Fourth Amendment's requirement of reasonableness. *See Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699 (1985). Reasonableness is a fact-specific inquiry that turns on such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).

> Deadly force is reasonable for the purposes of the Fourth Amendment when an officer (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

*Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005) (internal quotation marks omitted). Although we must construe the facts in the light most favorable to Hunter, reasonableness is determined from the perspective of the officer, and not with the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872.

20

1.

With these principles in mind, we find that, on the version of events outlined above, Kirk did not violate Hunter's Fourth Amendment rights when he fired his first round of shots at Hunter. It is undisputed that Kirk was responding to a 911 call of a man holding a child hostage at gunpoint, that gunfire had reportedly been exchanged, and that Hunter was a suspect in the shooting and was armed. From Kirk's perspective, then, he was pursuing an armed suspect who had just been involved in a shooting. Upon arriving at Hunter's home, Kirk gave repeated commands to Hunter to drop his weapon, all of which went unheeded. Instead, Hunter pointed his weapon at Kirk.

On these facts, Kirk undoubtedly would have had "probable cause to believe that [Hunter] pose[d] a threat of serious physical harm, either to the officer or to others," *Garner*, 471 U.S. at 11, 105 S. Ct. at 1701, when Hunter pointed his gun at Kirk. It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself. *See, e.g.*, *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010) (finding that an officer's use of deadly force was reasonable where the victim refused to drop his weapon after being repeatedly commanded to do so, and pointed his weapon several times in the officers' direction); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1168 (11th Cir. 2009) (per curiam) (finding that an officer was justified in using deadly force in response to

21

the suspect pointing his gun at the officer); *see also* Ala. Code § 13A–3–23(a)(1) ("A person may use deadly physical force, and is legally presumed to be justified in using deadly physical force in self-defense or the defense of another person . . . if the person reasonably believes that another person is . . . [u]sing or about to use unlawful deadly physical force."); Ala. Code § 13A–3–27(b) ("A peace officer is justified in using deadly physical force upon another person when and to the extent that he reasonably believes it necessary in order . . . [t]o defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force."). Therefore, at least on the facts as accepted at the summary judgment stage, Kirk did not violate Hunter's Fourth Amendment rights when he fired his first three shots at Hunter.

2.

However, while the use of deadly force may initially be justified, the level of force that is reasonable may change during the course of a police encounter. *See, e.g.*, *Glasscox v. City of Argo*, 903 F.3d 1207, 1214 (11th Cir. 2018). "*Graham* dictates unambiguously that the force used by a police officer . . . must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee*, 284 F.3d at 1198. The allowable level of continued force thus diminishes with the threat.

22

Accepting the evidence in the light most favorable to Hunter, a reasonable jury could find that Hunter no longer posed a threat of serious physical harm to Kirk when Kirk fired his second round of shots at Hunter. After Kirk fired his first three shots, Hunter recoiled back into his vehicle. Then, apparently in compliance with Kirk's commands to drop his weapon, Hunter dropped his gun through the opening in the car door. Kirk then, without further warning, fired seven more shots at Hunter,[17] who was now unarmed. Although Kirk initially may have had reason to believe that Hunter was armed and posed a danger to Kirk and the other officers, that belief would no longer be reasonable—and his actions no longer justified under either § 13A–3–23(a)(1) or § 13A–3–27(b)—once Hunter dropped his gun.[18] Hunter was not actively resisting arrest, nor attempting to charge or otherwise threaten Kirk. Kirk's firing of seven additional shots against a suspect who (accepting Hunter's version of events) had dropped his weapon and was apparently no longer resisting was disproportionate to the danger Kirk faced.

Nor would a "risk of flight" justify Kirk's use of deadly force. Although Hunter initially fled the Marlee Villa Apartments, at the time of the shooting he was parked in the carport behind his house and sitting in the passenger seat of his

---

[17] Kirk claims to have fired approximately three shots when Hunter first emerged from the car. A total of ten bullets were fired from Kirk's weapon, meaning he must have fired seven shots on his second volley.

[18] If Kirk claims he saw Hunter point his gun out of the open car door, then we can reasonably infer that Kirk would have also seen Hunter drop his gun out of the open car door.

23

car.  Moreover, by this time Kirk was also aware that at least three other officers had pursued Hunter to his residence, including Jackson, who was present on the scene.  No reasonable officer under these circumstances would believe that Hunter posed such a serious risk of escape that it was necessary to use deadly force, given that Hunter was no longer actively fleeing and was surrounded by at least four police officers.

On these facts, a reasonable jury could find that Kirk's continued use of deadly force was no longer proportionate to the danger presented, and thus his second round of shots constituted excessive force in violation of the Fourth Amendment.

Moreover, that Kirk's continued firing on Hunter constituted excessive force was clearly established at the time of the shooting in December 2013.  In 1985, the Supreme Court held that an officer may not use deadly force on a suspect who is unarmed and poses no immediate threat to law enforcement officers at the scene. *See Garner*, 471 U.S. at 11, 105 S. Ct. at 1701.  Since then, we have held that using deadly force without warning on an unarmed, non-resisting suspect who poses no danger is excessive.  *E.g.*, *Morton*, 707 F.3d at 1283; *Mercado*, 407 F.3d at 1160 (noting that it is a "clearly established principle that deadly force cannot be used in non-deadly situations").  For example, in *Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015), we held that our precedents and those of the Supreme Court made

24

clear that "[u]sing deadly force, without warning, on an unarmed, retreating suspect is excessive." *Id.* at 1294 (citing *Garner*, 471 U.S. 1, 105 S. Ct. 1694). Thus, the officer in *Salvato* had "fair warning" that she acted unconstitutionally in July 2012 when she used deadly force against a suspect who, although he had previously resisted arrest and struck the officers multiple times, was apparently unarmed and outside of striking distance, and the officer failed to warn the suspect before shooting him. *Id.* at 1293–94.

"[A]lthough officials must have fair warning that their acts are unconstitutional, there need not be a case on all fours with materially identical facts, . . . so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *Id.* at 1294 (alterations in original) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004)). The use of deadly force against a suspect who, though initially dangerous, has been disarmed or otherwise become non-dangerous, is conduct that lies "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct [is] readily apparent." *Lee*, 284 F.3d at 1199 (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000)); *see also Salvato*, 790 F.3d at 1294. As in *Salvato*, Kirk had "fair warning" that the continued use of deadly force against a suspect who, despite having initially threatened Kirk with deadly force, was now unarmed, out of striking distance, and no longer resisting, violated

25

the Fourth Amendment.  Therefore, we conclude that it was clearly established in December 2013 that Kirk's continued firing at a suspect who no longer presented an immediate risk of serious harm or flight, because he had relinquished his weapon (as ordered), constituted excessive force.

## B.

Hunter also brought an excessive-force claim against the other officers involved in the pursuit.  He claims that he was shot "multiple times" from "several directions," and that the other officers who shot him also subjected him to excessive force in violation of the Fourth Amendment.  Though we must resolve all reasonable inferences in Hunter's favor, "we draw these inferences only 'to the extent supportable by the record.'"  *Penley*, 605 F.3d at 848 (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 1776 n.8 (2007)).  When one party's version of events "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380, 127 S. Ct. at 1776; *see also Penley*, 605 F.3d at 848 ("[T]he requirement to view the facts in the nonmoving party's favor extends to genuine disputes over material facts and not where all that exists is 'some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986))).

26

Although Hunter claims that multiple officers shot him, there is simply no evidence in the record to indicate that anyone other than Kirk fired his weapon that day: the only bullet casings recovered were from Kirk's service weapon. In fact, all the evidence in the record indicates that the only two officers present on the scene at the time of the shooting were Kirk and Jackson. Hunter has offered no evidence contradicting the officers' statements regarding where they were at the time of the shooting, and so there is no dispute that Reaves and Chalian were not present on the scene when the shooting occurred. There is therefore no evidence from which a reasonable jury could conclude that anyone other than Kirk used any kind of force at all against Hunter.[19]

Nonetheless, an officer may still be held liable under § 1983, even if he did not use excessive force himself, if he was "present at the scene and . . . fail[ed] to take reasonable steps to protect the victim of another officer's use of excessive

---

[19] We recognize that a plaintiff is not required to specifically identify which particular officer used excessive force (and which officers failed to intervene) in order to overcome summary judgment. *See Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007) (per curiam). Just because a plaintiff does not see who shot him, does not mean that there is no evidence he can offer from which a reasonable jury could find an excessive use of force and assign liability. *Id.* For example, in *Velazquez* we found that the plaintiff's "testimony that two officers were present, coupled with [the officers'] admission that they were present, permit[ted] the jury, if it believe[d] that [the plaintiff] was beaten, to find that both of the officers administered the excessive force or that one beat him while the other failed to intervene." *Id.* That the two officers were present during the alleged beating permitted the inference that one or both of them beat the plaintiff. Here, on the other hand, there is no evidence suggesting anyone other than Kirk and Jackson were present at the scene, and no evidence that anyone other than Kirk fired his weapon. Thus, a jury could not draw a similar inference here, because there is no dispute that Kirk was the only officer that used any force against Hunter.

force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) (per curiam)). To be held liable on a theory of nonfeasance, the officer must have been in a position to intervene but failed to do so. *Priester*, 208 F.3d at 924.

But again, because Hunter has offered no evidence contradicting the statements by the officers that they were not present at the time of the shooting, he cannot show that any of the officers were in a position to intervene. Chalian only heard the first shots as he parked his car on a side street, and he was on the other side of the house when the second round of shots were fired. Reaves also heard the first shots only as he was exiting his car. Although he saw Kirk fire the second round of shots from a distance, he maintains that he could not see Hunter from his position. Thus, Hunter has offered no evidence indicating that Reaves or Chalian were in a position to intervene and prevent Kirk's use of excessive force. *See Ensley v. Soper*, 142 F.3d 1402, 1408 (11th Cir. 1998) (holding that an officer was not "in a position to intervene" where there was no evidence from which a jury could find that the officer observed or could have observed the excessive force).

While Jackson was present at the time of the shooting, he claims in his affidavit that he had a limited view of the carport where Hunter parked. From where he was standing beside the house, he saw Kirk fire his weapon at Hunter, but could not see where Hunter was or what he was doing at the time of the

28

shooting.  Therefore, although Jackson witnessed Kirk's use of force against Hunter, he could not have assessed at the time whether that use of force was excessive.  In other words, because he could not observe Hunter, and in particular whether Hunter pointed a weapon at or otherwise threatened Kirk, he could not know at the time whether Kirk's use of force was justified or unlawful.  Jackson thus cannot be held liable for failing to intervene where he could not have known at the time that what he was observing amounted to a constitutional violation.

In sum, Hunter has not presented any evidence from which a reasonable jury could find that Jackson, Chalian, or Reaves were involved in the unlawful shooting, or were in a position to intervene yet failed to do so.  They are therefore entitled to qualified immunity on Hunter's excessive force and failure to intervene claims.

## IV.

We now turn to Hunter's other claims.  Hunter brought assault and battery and tort of outrage claims against the officers under state law based on the shooting.  The officers argue that they are immune from suit on these state-law claims under Alabama's discretionary-function immunity.

Alabama law provides police officers with "immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  Ala. Code § 6–5–

29

338(a).  The restatement of state-agent immunity set out by the Alabama Supreme

Court in *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000), governs whether the

officers are entitled to immunity under § 6–5–338(a).  *Brown v. City of Huntsville*,

608 F.3d 724, 741 (11th Cir. 2010) (citing *Ex parte City of Tuskegee*, 932 So. 2d

895, 904 (Ala. 2005)).  The test laid out in *Cranman*, as modified by *Hollis v. City*

*of Brighton*, 950 So. 2d 300, 309 (Ala. 2006), provides in relevant part:

> A State agent shall be immune from civil liability in his or her personal
> capacity when the conduct made the basis of the claim against the agent
> is based upon the agent's . . . exercising judgment in the enforcement
> of the criminal laws of the State, including, but not limited to, law-
> enforcement officers' arresting or attempting to arrest persons, or
> serving as peace officers under circumstances entitling such officers to
> immunity pursuant to § 6–5–338(a).

*Ex parte City of Homewood*, 231 So. 3d 1082, 1087 (Ala. 2017) (internal quotation

marks and citations omitted).  In other words, law enforcement officers are

immune from tort liability for conduct within the scope of their discretionary law

enforcement duties.  *City of Huntsville*, 608 F.3d at 741.  Nonetheless, a state agent

is not entitled to state-agent immunity if (1) the U.S. Constitution, federal law, the

state Constitution, or state laws, rules, or regulations enacted or promulgated for

the purpose of regulating the activities of a governmental agency, require

otherwise; or (2) the agent acts "willfully, maliciously, fraudulently, in bad faith,

beyond his or her authority, or under a mistaken interpretation of the law."  *City of*

*Homewood*, 231 So. 3d at 1086; *Cranman*, 792 So. 2d at 405.

30

The test for state-agent immunity follows a similar burden-shifting framework as the test for qualified immunity.  First, the state agent asserting immunity "bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity."  *Ex parte City of Montgomery*, 272 So. 3d 155, 161 (Ala. 2018) (quoting *Ex parte Kennedy*, 992 So. 2d 1276, 1282–83 (Ala. 2008)).  The burden then shifts to the plaintiff to show that one of the two exceptions to immunity recognized in *Cranman* applies.  *Id.* Because the officers here were clearly performing discretionary law enforcement functions at the time of the shooting, the burden shifts to Hunter to show either that they failed to discharge their duties in accordance with the law or that they acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

The Alabama Supreme Court has largely equated qualified immunity with discretionary-function immunity, and so the same facts which establish an entitlement to qualified immunity may also establish that the officers are entitled to discretionary-function immunity.  *Sheth v. Webster*, 145 F.3d 1231, 1240 (11th Cir. 1998) (per curiam); *id.* at 1239 ("Under both Alabama law and federal law, the core issue is whether a defendant violated clearly established law.").

For the same reasons that Jackson, Reaves, and Chalian are entitled to qualified immunity on Hunter's § 1983 claim, we find that they are also entitled to

31

discretionary-function immunity on Hunter's state-law claims.  Hunter offers no evidence indicating that Jackson, Reaves, or Chalian used any force against him, or that they were in a position to prevent any unlawful use of force against him. Therefore, because Hunter cannot show that Jackson, Reaves, or Chalian participated in or were otherwise involved in the shooting, he cannot show that they took any actions related to the shooting which were "willful[ ], malicious[ ], fraudulent[ ], in bad faith, beyond [their] authority, or under a mistaken interpretation of the law."

By the same token, the same facts that establish that Kirk is not entitled to qualified immunity also establish that he is not entitled to discretionary-function immunity.  As we explained above, accepting the facts in the light most favorable to Hunter, Kirk acted beyond his authority and in violation of clearly established Fourth Amendment law when he continued to shoot at Hunter after Hunter dropped his gun.  The U.S. Constitution required Kirk to act otherwise.  *See Cranman*, 792 So. 2d at 405.  For the same reasons we deny Kirk qualified immunity on Hunter's § 1983 claim, we also deny him discretionary-function immunity on Hunter's state-law claims related to the shooting.

Kirk is also not entitled to immunity under § 13A–3–23(d)(1).  Under Alabama law, a person who is justified in using deadly physical force "is immune from criminal prosecution and civil action for the use of such force, unless the

32

force was determined to be unlawful." § 13A–3–23(d)(1).  Although Kirk might have been justified in firing his initial three shots against Hunter in self-defense, roe§ 13A–3–23(a)(1), he would not have been entitled to use deadly force in self-defense when he fired his next seven shots.  He is therefore not entitled to immunity from suit under § 13A–3–23(d)(1) for this latter use of deadly physical force.

In sum: Jackson, Reaves, and Chalian are entitled to immunity on Hunter's state-law claims related to the shooting, but Kirk is not.

## V.

For the foregoing reasons, we **AFFIRM** the District Court's denial of qualified and state-law immunity as to Kirk and **REVERSE** the District Court's denial of qualified and state-law immunity as to Jackson, Reaves, and Chalian.

**SO ORDERED.**

GILMAN, Circuit Judge, concurring:

I fully concur in the result reached by the lead opinion; i.e., that Officer Kirk is not entitled to qualified immunity as a matter of law, but that the other officers are. The reason that I write separately, however, is because I see no reason for us as appellate judges to weigh in on which one of the three gun-pointing "scenarios" is most favorable to Hunter.

As well stated in the lead opinion, "[u]ltimately[] a jury must resolve the fact question regarding how many times Hunter pointed his weapon at Kirk and when." (Lead Op. at 17) Contrary to the wording in the lead opinion, this does not "require[] us to assume that the events of December 16, 2013, unfolded as outlined in the second factual scenario." (*Id.*) Since we are holding that Hunter is entitled to a jury trial regarding his entire interaction with Officer Kirk, this means that the jury will be free to decide for itself which scenario, if any, favors Hunter. I thus regard the lead opinion's focus on scenario two as unnecessary dicta.