[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12375

Non-Argument Calendar

_____

ALTAGRACIA BANUCHI,
as Personal Representative of the Estate of
Edward Blanton Foster III, and o.b.o. the
Estate of Edward Blanton Foster III and the
survivors of the Estate, E.F., J.F., A.D.F., N.F.,
M.F., and A.B.F.,

                                        Plaintiff-Appellant,

*versus*

CITY OF HOMESTEAD,
ANTHONY GREEN,
individually and as an employee of the City
of Homestead,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-25133-RNS

_____

Before NEWSOM, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

This case arises out of the tragic shooting of Edward Blanton Foster III by City of Homestead police officer Anthony Green. On behalf of Foster's estate, Altagracia Banuchi, the personal representative, appeals the district court's summary judgment for the City and Green in this section 1983 excessive force action. Banuchi raises three issues on appeal. First, she contends that the district court erroneously weighed the evidence in favor of Green when it granted summary judgment. Second, she argues that her first amended complaint should not have been dismissed because she properly set forth a *Monell* claim against the City. And third, she asserts that the district court abused its discretion in denying her leave to amend her *Monell* claim in a third amended complaint. After careful review, we affirm.

## FACTUAL BACKGROUND

Green was on duty and in uniform on July 16, 2015, when dispatch alerted him that a 911 caller had just reported that a "light-skinned male" in red basketball shorts and a white or black shirt was carrying a firearm and walking east through a city park. As

Green approached the area, he saw Foster, a light-skinned black male wearing a black shirt and red basketball shorts. Foster appeared nervous and agitated. He walked at a quick pace and repeatedly looked over his left shoulder, with the left side of his shorts hanging "way down" from the weight of "something very heavy." In Green's experience, the manner in which Foster's shorts sagged indicated that he was likely carrying a firearm. Green pulled up to Foster in his police car, with both front windows rolled down, drew his firearm, pointed it at Foster through his windshield from the driver's seat, and yelled, "Let me see your hands, put your hands up, let me see your hands, let me see your hands." Foster "immediately" retrieved a firearm from his left side waistband, according to Green. Foster then pivoted towards Green, bringing the gun up towards Green, when suddenly Foster became startled and took off running.

Green says Foster carried his firearm in his right hand while he ran away. As Green drove after Foster, he yelled out of the window, "Stop, drop the gun, stop, drop the gun, drop the gun." While continuing to run, Foster made eye contact with Green and began to raise his firearm across his body. As soon as Foster pointed his firearm at Green, Green fired eight rounds at Foster. Green says he stopped firing as soon as he saw Foster's legs start to buckle. Seconds later, Green heard Foster's firearm hit the ground. Green exited his car with his gun drawn and positioned himself behind the engine area of his car before radioing for backup. Green advised over the radio, "Shots fired. Subject down with a gun."

Daryl Mays, another Homestead police officer, arrived at the scene at that time.  Mays did not see Green shoot Foster, but he saw Foster fall to the ground just as he approached the scene. Mays noticed the gun on the ground beside Foster and kicked it away so Foster could not reach it.

Mays handcuffed Foster while Green radioed for medical support, but when Green and Mays noticed Foster was having difficulty breathing, they took him out of the handcuffs and administered aid.  While Green performed CPR, Foster became nonresponsive.  Paramedics arrived shortly after and transported Foster to a hospital.

The Miami-Dade State Attorney's Office and the Miami-Dade Police Department began investigating the incident that month, July 2015, to determine whether Green violated Florida law.

## PROCEDURAL HISTORY

Banuchi filed her first lawsuit against the City and Green two years later, on July 17, 2017, in state court.  The City and Green later removed that action to federal court on September 11, 2018. Then, on April 9, 2020, Banuchi voluntarily dismissed the action to wait until the Miami-Dade State Attorney's Office and Miami-Dade Police Department completed their investigations into Green's shooting.

Before the completion of the investigations, Banuchi filed a second action in state court, alleging only state law claims against the City and Green, on July 29, 2020.  Banuchi filed this second

action "in an abundance of caution" to ensure that this complaint, which she said was the "same complaint" already filed in federal court, was not "jurisdictionally out-of-time."

The Miami-Dade State Attorney and the Miami-Dade Police Department ended their investigations on October 6, 2020.

The following month, Banuchi moved to reopen her first lawsuit, now in federal court, on November 11, 2020. Banuchi also amended the complaint in her state court action on December 10, this time asserting federal section 1983 claims. The following week, on December 16, the City and Green removed Banuchi's second action to federal court. Then, on January 8, 2021, the district courts adjudicating the two actions agreed to transfer the later-filed federal action to the first district court because both actions had "the same subject matter and defendants."

In her first amended complaint from December 10, Banuchi raised ten counts. She raised three federal claims—Fourth and Fourteenth Amendment claims under section 1983—against the City (counts IV and V) and Green (count I). She raised seven state law claims: assault and battery claims against the City (count VI) and Green (count II); state law false imprisonment claims against the City (count VII) and Green (count III); a claim for negligent use of a firearm against the City (count VIII); and negligent training and supervision against the City (count IX). And finally, Banuchi alleged a state law wrongful death claim against both the City and Green (count X).

The City and Green moved to dismiss Banuchi's complaint. They argued that:  Green was entitled to qualified immunity as to Banuchi's Fourth and Fourteenth Amendment claims; Banuchi failed to properly raise a *Monell* claim against the City; her state law claims were time-barred or improperly alleged; and her complaint was a shotgun pleading.

The district court dismissed all counts with prejudice except for two claims: Banuchi's section 1983 Fourth Amendment claim against Green—which it left intact—and her state wrongful death claim against the City and Green—which it dismissed without prejudice.  For her Fourth Amendment claim, the district court concluded that Banuchi met her burden at that stage to show that Green was not entitled to qualified immunity.  As to Banuchi's state wrongful death claim, the district court advised Banuchi that she could amend her complaint to replead this claim in a "discrete and succinct manner such that [the City and Green] have fair notice of the claims against them."

Banuchi timely filed her second amended complaint, repleading the state wrongful death claim.  But nine days later, Banuchi moved for reconsideration, clarification, and leave to file a third amended complaint.  Banuchi explained she needed to file a third amended complaint to allege additional instances disclosed through discovery where Green used excessive force on the job and which she said the City never "fully investigated."  She also asked the district court to reconsider and clarify (1) its order requiring that she reallege the state wrongful death claim in only one

count, and (2) its order dismissing her *Monell* claims against the City.

The district court denied Banuchi's motion "in its entirety." In denying her requests for reconsideration and clarification, the district court explained that nothing in this case warranted such an "extraordinary remedy." Rather, Banuchi (1) failed to allege facts that would allow the district court to infer a municipal policy, (2) asserted arguments plainly belied by the record, and (3) provided no legal basis to warrant either reconsideration or a clarification. In denying her motion for leave to file a third amended complaint, the district court explained that Banuchi failed to show good cause under Federal Rule of Civil Procedure 16(b) to obtain the right to amend, and failed to show the requisite diligence. Because Banuchi did not demonstrate why the new evidence she wished to cite in her third amended complaint was unavailable to her before the passing of the deadline to amend, and because the evidence had been "readily available" for years through public record or discovery requests, the district court denied her motion for leave to amend.

Later, the district court granted summary judgment in favor of the City and Green. Two counts remained before the district court at this stage: a section 1983 claim alleging excessive force against Green under the Fourth Amendment, and a state-law wrongful death claim asserted against Green and the City. As to the Fourth Amendment claim, the district court determined Green was entitled to qualified immunity because (1) Green was "acting

within the scope of his discretionary authority when the allegedly wrongful act occurred," and (2) Banuchi failed to carry her burden to show that Green's conduct "violated a constitutional right."[1]

As to Banuchi's state-law wrongful-death claims, the district court concluded that both Green and the City were immune under Florida law. Banuchi failed to identify "any" action taken by Green that amounted to "bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Similarly, Banuchi's state-law wrongful death claim against the City was barred under Florida law because Banuchi failed to show that Green's use of force was unreasonable under the circumstances. Florida law, the district court explained, provides that "an officer who 'reasonably believes' his use of force is 'necessary to defend himself or herself or another from bodily harm while making [an] arrest" is afforded a complete defense to an excessive force claim. The district court concluded that Green was entitled to a complete defense because Banuchi did not rebut Green's evidence that Foster gave flight, refused to comply with Green's commands, and pointed a gun at Green. And since Green was entitled to a complete defense, the City was also entitled to a complete defense.

---

[1] The district court did not reach the third qualified-immunity question as to whether Banuchi showed that the constitutional right was clearly established at the time of the violation because the district court concluded that Green did not violate a constitutional right.

**STANDARD OF REVIEW**

We review an order on a motion to dismiss de novo. *See Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019). "We review de novo a grant of summary judgment." *Buckley v. Sec'y of Army*, 97 F.4th 784, 792 (11th Cir. 2024). A district court's decision to deny leave to amend is reviewed for abuse of discretion. *Smith v. Duff and Phelps, Inc.*, 5 F.3d 488, 493 (11th Cir. 1993).

**DISCUSSION**

On appeal, Banuchi argues that the district court erred by: improperly weighing the evidence in favor of Green and the City when it granted them summary judgment; dismissing Banuchi's *Monell* claim in her first amended complaint; and denying her leave to amend her *Monell* claim in a third amended complaint. We address each issue below.

A.

Banuchi contends that the district court misapplied the summary judgment standard by weighing the evidence in Green and the City's favor. She argues that the testimony of several witnesses who did not notice a gun in Foster's hands proves that Foster did not have a gun, and therefore, he could not have pointed it at Green. Thus, Banuchi says, because the district court must weigh the evidence in her favor, the district court erred by granting summary judgment for the City and Green.

Summary judgment is appropriate where the evidence establishes that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A district court must, on summary judgment, analyze the evidence and inferences in the light most favorable to the nonmoving party; here, Banuchi. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). At the same time, Rule 56 does not require the district court to regard "mere allegations or denials" as a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Rather, the nonmoving party must present "specific facts showing a genuine issue for trial" to overcome a finding of summary judgment against her. *Id.* And where a district court could not find in the nonmovant's favor after reviewing the complete record, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Here, the evidence showed that Foster was a threat of serious harm to Green and others. *See Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004) ("[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." (quotation omitted)). The incident began with a 911 call reporting that a man was carrying a gun near a park known for fights and shootings. When Green first observed Foster, Foster was walking across the street from that park, traveling in the direction mentioned in the 911 call, and matching the caller's description of the man. Foster appeared nervous and agitated, and Green observed something heavy weighing down Foster's shorts on one side. Given all of this, and to protect himself, Green drew his own gun and approached Foster,

commanding him to show his hands. *See United States v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983) ("The use of a gun in connection with a stop is permissible when the officer reasonably believes it is necessary for his protection.").

Foster refused to obey Green's commands. Instead, Foster ran from Green. Green pursued Foster, repeating his command that Foster stop running and drop his gun, but Foster refused to stop running. Then, according to Green, after Foster pointed his gun at Green, Green opened fire on Foster. Investigators recovered a firearm at the scene that Green said Foster dropped there, and that another officer observed on the ground next to Foster when he arrived at the scene. If undisputed, this evidence shows that Green did not use excessive force in firing at Foster. *See Hunter v. City of Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019) ("It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself.").

But Banuchi argues that the evidence is disputed. She points to the testimony of three witnesses—Mays, Alexander Gutierrez, and Julius Hall—who saw Foster running from Green while using his hands to hold up his shorts. Banuchi explains that because these witnesses did not observe Foster holding a gun while he ran "Rule 56 mandate[s] the district court construe the facts in the light most favorable to [Banuchi] and accept the position that Foster was unarmed and therefore pointed no gun at Green." And Banuchi contends that Green's account conflicted with the autopsy report showing that the bullets entered the back of Foster's body back to

front and left to right.  These two matters, Banuchi maintains, create issues of material fact that a jury must review.

We disagree.  First, the three witnesses did not see the critical moments before and during the shooting, so their testimony could not create a genuine issue on whether Foster pulled the gun on Green before Green fired.  Gutierrez admitted in his sworn statement that he "couldn't really actually see everything" because "everything happen[ed] so fast."  Hall testified that his "vision [was] blurred" because Foster ran around the building, and he agreed that he lost sight of Foster when the stoplight turned green.  And Mays swore that he was around the corner when he heard the shots were fired.  The only testimony we have from the moments before and during the shooting is from Green and he testified that Foster pulled his gun and pointed it at Green.  The gun found next to Foster corroborates Green's testimony and nothing contradicts it.

Second, Banuchi is wrong about what the autopsy report showed.  The autopsy found that Foster was shot from the front in his left upper arm and in his left thigh.  And the autopsy report found that Foster was shot on his right-side buttock.  The shots, in other words, were not all fired from back to front and left to right, as Banuchi argues.

In the end, like the district court, we are left with the undisputed evidence that Foster had a gun and pointed it at Green before Green fired.  Based on this undisputed evidence, we must conclude, like the district court, that Green did not use excessive force in his response to the threat of deadly force.  The district court

properly granted summary judgment for Green on Banuchi's section 1983 claim.

## B.

Banuchi also contends that the district court erred in dismissing her *Monell* claim against the City and in denying her leave to amend the *Monell* claim to add more allegations about the City's customs and practices. We disagree.

"To impose *Monell* liability, 'a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.'" *Underwood v. City of Bessemer*, 11 F.4th 1317, 1333 (11th Cir. 2021) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)). In other words, "the plaintiff must demonstrate the municipality's policy or custom was the 'moving force' behind the . . . constitutional violation." *Id.* (citation omitted). But a custom or policy "cannot be the 'moving force' of a constitutional violation if there is no constitutional violation." *Turner v. Williams*, 65 F.4th 564, 589 (11th Cir. 2023) (citation omitted).

That's the case here. As discussed above, the evidence, when viewed in the light most favorable to Banuchi, showed that there was no constitutional violation. So whatever custom or policy Banuchi alleged in her first amended complaint or wants to allege in a third amended complaint cannot be the moving force of a constitutional violation under *Monell*—because there was none.

Thus, any remand on the *Monell* claim would be futile because the result would be the same—judgment for the City.

## CONCLUSION

Foster's death is a tragedy.  But because "[i]t is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself," *Hunter*, 941 F.3d at 1279, and because it was undisputed that Green was threatened with deadly force, the law requires that we affirm the summary judgment for Green and the City.  So we do.

**AFFIRMED.**