[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11333

_____

PAUL DONALD DAVIS,
KATHY DAVIS,

Plaintiffs-Appellants,

*versus*

PAUL WALLER,
SHAUN BROWDER,

Defendants-Appellees,

SCOTT WALDROUP,
ANDREW DRAKE,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 3:18-cv-00134-CAR

_____

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Paul Donald Davis ("Davis") was taken hostage by a fleeing felon in rural Georgia. The felon, William Arnold ("Arnold"), forced Davis at gunpoint to drive an 84,000-pound truck loaded with timber to escape the pursuing officers. Davis drove the truck toward seven officers gathered at the scene and showed no signs of stopping. As the logging truck struck the police vehicles lining the dirt road, several of the officers opened fire on the cab of the truck, even though they allegedly knew Davis -- an innocent hostage -- was being forced to drive.

Davis survived but was shot in his hand, his fingers, his hip, and his shoulder. He sued Georgia State Patrol Lieutenant Paul Waller ("Waller") and Georgia State Patrol Trooper Shaun Browder ("Browder") in their individual capacities (collectively, "Defendants") for violating his Fourth and Fourteenth Amendment Rights. The Defendants moved for summary judgment, arguing that they were entitled to qualified immunity. The district court agreed and granted summary judgment because their actions

were reasonable and, even if they were not, they did not violate any clearly established law.

We affirm.

## I.

This tragic story[1] begins when William Arnold shot his pregnant girlfriend and took his grandmother hostage at his home in Oglethorpe County, Georgia.[2] Hostage negotiations eventually failed, and Arnold fled his house in his red pickup truck, taking his wounded girlfriend with him. Arnold eventually threw his pregnant girlfriend from his moving truck and continued his escape. He then encountered law enforcement officers Browder and Waller, who had been called to the scene by police responding to the initial hostage taking. Arnold made a U-turn as soon as he saw the officers and fled. The officers gave chase.

After a brief pursuit, Browder's and Arnold's vehicles ended up facing each other. Arnold began shooting at Officer Browder. When Browder returned fire, Arnold reversed and drove away. Browder tried to follow in his car, but his police cruiser could not

---

[1] Because we review the district court's grant of summary judgment, we offer these facts from the record as taken in the light most favorable to Davis and with all inferences drawn in his favor. *See Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1165, 1167 (11th Cir. 2005).

[2] Arnold admitted to being high on methamphetamine throughout these events.

cross the off-road terrain, so Browder pursued Arnold on foot. Browder came to a single-lane, dirt road where he saw Arnold's red pickup truck parked perpendicular to a curve in the road, which led to the entrance of the logging site where Plaintiff Don Davis worked. Another deputy was parked at the scene, about 70 yards from Arnold's red truck; the two officers called for backup.

Meanwhile, Arnold's truck ran out of gas, and he began searching for a new vehicle at the logging site in which to escape.[3] Inside one of the trucks at the logging site, Arnold found a loaded .22 caliber rifle. He then ordered Davis, at gunpoint, to drive his 84,000-pound logging truck in order to help him escape. Davis says he drove for "10 or 15 minutes" and at "5-10 miles per hour" while Arnold hid in the footwell, trying to push the gas pedal with his hands, before the truck arrived at Arnold's abandoned red pickup truck blocking the road.

Shortly before Waller and other officers arrived on the scene, Davis had called 9-1-1. Dispatchers relayed over the radio that Arnold had "hijacked" a logging truck, that he was armed, and that he had forced a hostage to drive the truck. Some of the officers dispute whether they received the message, but the district court,

---

[3] The site was about a quarter mile off Centerville Road, which Defendants describe as "a main thoroughfare for many in Oglethorpe County," but Plaintiff highlights deposition testimony stating that the nearest town is "three or four" miles "as the crow flies" from where officers shot Davis.

viewing the facts most favorably to Davis, assumed both Defendants knew Arnold had forced a hostage to drive the logging truck at gunpoint.  D.E. 64 at 9 n.56.

All the while, several officers, including Waller, heard over the police radio that Browder and Arnold had exchanged gunfire and that Arnold's red truck had been found on a logging road -- so they drove to the logging road and parked behind the police vehicle already on the scene.  Within a "minute, [or] minute and a half," as the officers and six police vehicles congregated on the logging road, Davis's logging truck was about to knock Arnold's red pickup truck out of its way.

Davis hesitated to ram Arnold's red pickup truck out of the way and continued driving toward the officers and their vehicles. But Arnold, who was in control of the truck, demanded that he do so, firing his rifle for emphasis, and shattering the driver's side window.  The officers heard the gunshot and took cover behind their vehicles because they did not know who or what the shooter was targeting.

After having pushed Arnold's pickup truck out of the way, Davis continued to drive toward the officers and their parked vehicles.  As the logging truck began to knock the police vehicles out of the way, the officers bailed out from behind their vehicles and began firing their weapons at the moving truck.  Officer Browder, who was only five feet away, fired his semi-automatic rifle at least two times and Waller fired his shotgun two or three times.

21-11333                 Opinion of the Court                            6

The logging truck finally came to a stop after it had struck one of the patrol cars.  Davis managed to knock the truck out of gear, put his hands up, and "bailed" out of the truck.  Almost simultaneously, as Davis was exiting the truck, Waller fired one more shot and struck Davis in the shoulder.  As Waller put it in his deposition, "[w]hen that door burst open, I certainly shot towards that direction."  D.E. 36-22 at 107.  And Davis characterized the timing of the final shot this way: "Q: As you were getting out of the door, you believe you got shot in the shoulder? A: That's right."  D.E. 36-7 at 105.  When all was said and done, Davis had been struck nine times.  He suffered many physical and psychological injuries and still does not have full use of his hand.

Davis sued the Defendants in the Middle District of Georgia in their individual capacities for violating his Fourth Amendment right to be free from excessive force and for violating the Fourteenth Amendment right to substantive due process pursuant to § 1983.[4]  The district court granted summary judgment to the Defendants, reasoning this way:

> Although Plaintiff was a hostage, as the driver of the
> log truck, he posed not only a threat of serious

---

[4] Davis originally sued four Defendants -- Georgia State Patrol Lieutenant Paul Waller, Georgia State Patrol Trooper Shaun Browder, Oglethorpe County Sheriff's Office Corporal Scott Waldroup, and Oglethorpe County Sheriff's Office Investigator Andrew Drake.  Waldroup and Drake have been dismissed with prejudice following a settlement.

physical harm to the officers and others, but Plaintiff
was also facilitating the escape of an armed and dan-
gerous suspect. Thus, Defendants' use of deadly force
when they fired at Plaintiff in the driver's side of the
truck was reasonable to protect themselves and oth-
ers and prevent Arnold's escape.

D.E. 64 at 16. The district court further determined that issuing a
warning before using deadly force was not feasible under the cir-
cumstances. Waller acted reasonably when he shot Davis as Davis
exited the vehicle. The district court observed that Waller could
have reasonably believed that Arnold (not Davis) actually exited
the truck and that Arnold would continue to attack the officers. *Id.*
at 17–19. Finally, the district court concluded that "[e]ven if the
Defendants' actions were not reasonable, no clearly established law
notified Defendants their conduct was unlawful." *Id.* at 19.

Davis timely filed this appeal.

## II.

We review *de novo* a district court's summary judgment rul-
ing on qualified immunity grounds. *Morton v. Kirkwood*, 707 F.3d
1276, 1280 (11th Cir. 2013). Summary judgment is appropriate only
when there are no genuine disputes of material fact, and the mo-
vant is entitled to judgment as a matter of law. *Id.*

## A.

Qualified immunity shields "government officials perform-
ing discretionary functions . . . from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity balances two important public interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This form of immunity allows law enforcement to work without fear of liability, protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks omitted). "The burden then shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* To overcome the defense of qualified immunity, the plaintiff must show first, that the defendant violated a constitutional right and, second, that the right was "clearly established." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

We have identified three ways that a plaintiff can prove that a particular constitutional right is clearly established. *Waldron v. Spicher*, 954 F.3d 1297, 1304 (11th Cir. 2020). First, a plaintiff can show that a materially similar case has already been decided. *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). This category consists of binding precedent tied to particularized facts in a materially similar case. "[A] case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official [ ]." *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002). Only materially similar cases drawn from the United States Supreme Court, this Circuit, and/or the highest court of the relevant state can clearly establish the law. *Waldron*, 954 F.3d at 1304–05.

Second, a plaintiff can also show that a broader, clearly established principle should control the novel facts of a particular case. "[T]he principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1205 (11th Cir. 2012) (alteration in original) (quotation marks omitted).

Finally, a plaintiff can establish that the case "fits within the exception of conduct which so obviously violates [the] [C]onstitution that prior case law is unnecessary." *Mercado*, 407 F.3d at 1159. This test is a narrow category encompassing those circumstances

where "the official's conduct lies so very obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding lack of case law." *Loftus*, 690 F.3d at 1205 (alteration in original) (quoting *Terrell v. Smith*, 668 F.3d 1244, 1257 (11th Cir. 2012)).

## B.

There is no question that the officers were acting in their discretionary capacities when they fired at the cab of the moving logging truck. We begin, then, with whether the officers' actions were reasonable. If they were, the officers did not violate Davis's constitutional rights under the Fourth Amendment. *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010). Because Davis and Arnold posed an imminent risk of serious physical harm or death to the officers and to the public, we are satisfied that Defendants' decisions to shoot at a moving, 84,000-pound logging truck were reasonable.

Our case law has repeatedly held that "a police officer may use [ ] [deadly force] to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015). We have concluded "that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" *Id.* (quoting *Robinson ex rel. Walters v. Arrugueta*,

415 F.3d 1252, 1256 (11th Cir. 2005)). Critically, "the determination of reasonableness must be made from the perspective of the officer." *Robinson*, 415 F.3d at 1255. And the reasonableness assessment must be made at the time the force was used, "rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The facts, viewed in the light most favorable to Davis, show at least this much: First, Browder and Waller knew Arnold was in the truck; that he had just escaped after fatally shooting his pregnant girlfriend, whom he had thrown out of a moving vehicle; that he had taken his grandmother hostage; and that he had shot a weapon several times at Officer Browder. Second, the police officers were forced to hide behind their cruisers as an 84,000-pound truck loaded with timber drove straight at them; and they watched as a rifle shot rang out from the cab of the truck just before it barreled through Arnold's red pickup truck sitting in the middle of the road. Third, the Defendants saw no sign that the truck would stop as it began to ram police vehicles in the road. Based on these extraordinarily dangerous facts, any reasonable officer would reasonably believe that his own life was in imminent danger and that Davis and Arnold, in control of the logging truck, jeopardized others if Arnold managed to escape. *See Tenn. v. Garner*, 471 U.S. 1, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.").

On these undisputed facts, Davis's claim that the use of deadly force was unreasonable is squarely foreclosed by our precedent. Among other things, he suggests that it was unreasonable for the officers to believe that Davis and Arnold posed a serious threat of physical harm. The truck, he says, was moving slowly; it was easily identifiable and could be tracked; many officers were gathered at the command center and were available to assist if the logging truck made it to a public road; and Arnold did not have a clear shot at the officers.

But we have "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians [ ]." *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009). Thus, for example, in *McCullough v. Antolini*, the plaintiff revved his engine with an officer trapped "just inches" away and drove his truck toward a police cruiser. We held the use of deadly force was reasonable. *Id.* at 1208. Or take our previous decision in *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002). In that case, a panel of this Court upheld an officer's use of deadly force against a fleeing suspect who, a few seconds before the shooting, had been driving hazardously and had swerved his car at police officers. *Id.* at 1277, 1282. If anything, the facts presented in this case were far more dire.

In still another case, a panel of this Court addressed a similar, but not nearly as extreme a case as this one in *Robinson ex rel.*

*Walters v. Arrugueta*.  There, we granted qualified immunity to an officer who used deadly force when a suspect *slowly* -- at one or two miles per hour -- drove a vehicle forward toward an officer who was standing between the suspect's vehicle and a parked car. The officer's use of deadly force was reasonable because "[e]ven if in hindsight the facts show that Arrugueta perhaps could have escaped unharmed, . . . a reasonable officer could have perceived that [decedent] was using the [car] as a deadly weapon. . . . [Accordingly,] Arrugueta had probable cause to believe that [decedent] posed a threat of serious physical harm." *Robinson*, 415 F.3d at 1256.

Moreover, we have consistently said that it is reasonable for an officer to believe that a suspect poses "an immediate risk of serious harm to [him]" when the suspect is armed.  *Garczynski v. Bradshaw*, 573 F.3d 1158, 1169 (11th Cir. 2009); *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997) ("[A]n officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force.").  And as we know, Davis and Arnold were armed with more than just the logging truck -- Arnold also had a .22 caliber rifle that he had fired at least once before in the lead up to the use of deadly force.  That the logging truck was moving slowly or that Arnold did not have the officers in his rifle sights did not make the officers' belief that Arnold and Davis posed an imminent risk of serious physical harm or death to the officers and the public any less reasonable.  *See Jean-Baptiste*, 627 F.3d at 821 ("Regardless of whether Jean-Baptiste had

21-11333                 Opinion of the Court                    14

drawn his gun, Jean-Baptiste's gun was available for ready use, and Gutierrez was not required to wait 'and hope[] for the best.'") (alteration in original) (citation omitted). A fully loaded logging truck was converted into a deadly weapon as it moved directly at the officers at 5 to 10 miles per hour. "It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself." *Hunter v. Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019).

To the extent Davis suggests that deadly force may never be used against an innocent victim, we can find no case asserting that proposition so categorically.[5] And we decline to do so today. Each case turns on its peculiar facts and circumstances. The application of deadly force may be reasonable when it prevents an even graver and more imminent danger to the officers and to the public.

## C.

---

[5] This thesis is redolent of the Trolley Problem, an ethical thought experiment in which a runaway trolley is about to run over five people tied to the track, but a bystander has the opportunity to pull a lever and divert the trolley down a path with only one person in harm's way. Judith Jarvis Thompson, *The Trolley Problem*, 94 YALE L.J. 1395 (1985). Should the bystander make the affirmative choice to kill one person while saving five, or do nothing?

While the outcomes of either choice were not nearly as certain here as in the hypothetical, by Davis's telling, the officers had no choice but to let the trolley roll on by. We disagree.

Nor, on these facts, were the officers required first to issue a warning before using lethal force.  Officers are required to give a warning before using deadly force if a warning is feasible.  The critical inquiry is feasibility.  *Cantu v. City of Dothan*, 974 F.3d 1217, 1229 (11th Cir. 2020).  And we have declined "'to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such a warning might easily have cost the officer his life.'"  *Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003) (emphasis omitted) (quoting *McLenagan v. Karnes*, 27 F.3d 1002, 1007–08 (4th Cir. 1994)).  Browder and Waller say a warning was not feasible because "[t]he situation was happening so fast that the officers could not safely expose themselves."  Appellees' Br. at 34.  Nothing in the record controverts this obvious conclusion.  To require an officer to give a warning before firing a shot would have forced the officer to place himself in the immediate path of an oncoming 84,000-pound truck or the path of a potential bullet.  Neither reason nor case law requires that decision.

Davis also cites *Vaughan v. Cox* in order to establish that a warning was feasible.  We remain unpersuaded.  In *Vaughan*, police officers in the middle of a high-speed chase fired at the suspect's car and hit the passenger.  343 F.3d at 1327.  The passenger, Vaughan, complained that the officer's decision to fire without first warning was unreasonable and violated his constitutional rights.  The district court granted summary judgment to the defendant, finding the officer acted reasonably, but a panel of this Court

reversed. *Id.* at 1328. Viewing the facts in a light most favorable to Vaughan, when the defendant "discharged his weapon, he simply faced two suspects who were evading arrest and who had accelerated to eighty to eighty-five miles per hour in a seventy-miles-per-hour zone in an attempt to avoid capture." *Id.* at 1330. The Court held that "[u]nder such facts, a reasonable jury could find that Vaughan and Rayson's escape did not present an immediate threat of serious harm to [the officer] or others on the road." *Id.* Because a reasonable jury could find that deadly force was unnecessary, *a fortiori*, "a reasonable jury could find that it was feasible for [the officer] to warn Vaughan and Rayson of the potential use of deadly force." *Id.* at 1331.

This case is different in several critical ways. Foremost, here, a reasonable jury could only conclude that Davis and Arnold posed an imminent threat of serious physical harm or death to the officers and to the public. In *Vaughan*, we held a reasonable jury could conclude that Vaughan and Rayson did not pose such an imminent risk. The significant factual differences between *Vaughan* and this case explain the different results: Arnold was known to be an exceedingly violent felon, while Vaughan and Rayson allegedly stole a car from a service station; Davis already had run over a vehicle that stood in his way, while Vaughan and Rayson used no evasive maneuvers other than accelerating to 85 MPH on the highway; and Davis was driving the logging truck straight *at* the officers and Arnold had already shot at them, while Vaughan and Rayson were trying to flee.

Davis argues in the alternative that the officers should have employed less lethal tactics. Again, we are unpersuaded. "There is no precedent in this Circuit [ ] which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. There are, however, cases which support the assertion that, where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first." *Menuel v. City of Atlanta*, 25 F.3d 990, 996 (11th Cir. 1994) (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1148–50 (7th Cir. 1994)).

"In examining whether an officer's use of deadly force is reasonable, we recognize that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (quoting *Graham*, 490 U.S. at 397). And "[w]e are loath to second-guess the decisions made by police officers in the field." *Vaughan*, 343 F.3d at 1331. Here, the officers encountered an 84,000-pound truck rolling toward them with an armed felon inside and fully in control. Even if the officers had attempted to shoot the tires out or attempted to shoot at the engine, the momentum of the truck almost surely still would have carried the massive vehicle into the officers. And doing nothing, while waiting for the truck to reach the command center on the main road was not a reasonable option -- the officers would still have been left vulnerable on the barren logging road to gunfire from Arnold.

Additionally, the officers had no reason to believe that waiting for the other officers at the command center to stop the logging truck later would be any safer for those officers or the public. *See City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015) ("The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others.") (quotation marks omitted). At bottom, on the peculiar and tragic facts presented, we cannot second guess the officers' split-second decisions because they reasonably feared for their own lives and the lives of others.

## D.

But even if we were to assume that the officers' actions somehow were unreasonable -- and we do not -- they did not violate clearly established law. To offer a case with materially similar facts, Davis proffers *Vaughan* and *Morton*, 707 F.3d 1276. But *Vaughan* is not materially similar for the reasons we have already described, and it does not clearly establish the right Davis asserts. Nor does *Morton*. There, the police shot a driver who, when viewing the facts in the light most favorable to the non-moving party, sat stationary in his car with his hands raised before he was struck. *Morton*, 707 F.3d at 1285. Furthermore, the officer had no reason "to believe that Morton was a threat to anyone." *Id.* at 1282. In sharp contrast, here, the officers had ample reason to believe that Davis was driving the logging truck at them with Arnold in control. These cases are worlds apart. *Morton* cannot create clearly

established law for the conduct these officers faced.    Neither *Vaughan* nor *Morton* would have placed the officers on notice that they could not lawfully discharge their weapons in this case.

Finally, Davis offers that "[i]ntentionally shooting an unarmed and innocent hostage to capture the hostage's fugitive captor shocks the conscience and is obviously unconstitutional."  Appellant's Br. at 59.  He makes a substantive due process argument here, rather than a Fourth Amendment one.  *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1375 (11th Cir. 2002) ("As a general rule, to prevail on a claim of a substantive due-process violation, a plaintiff must prove that a defendant's conduct "shocks the conscience.'") (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 836, 846–47 (1998)).  But where a plaintiff alleges that law enforcement officers have used excessive force to make an arrest or other seizure -- as Davis plainly does -- substantive due process claims are foreclosed.  "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."  *Graham*, 490 U.S. at 395.  *See also Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951–52 (11th Cir. 2019) (specifying that it is the Fourth Amendment, rather than the Fourteenth, that guides our analysis of excessive force during arrests).

Our fidelity to doctrine has no practical effect on the outcome of this appeal.  Again, the essence of the calculus in a Fourth

Amendment excessive force case is reasonableness -- it is far easier for a plaintiff to show a defendant's behavior was unreasonable than to show it shocks the conscious. And as we've observed, Davis cannot meet this less demanding burden. The officers made the split-second decision to shoot in a tense and deadly crucible, balancing the harm posed to Davis against the imminent danger posed to them and to unknown civilians on the public roads. *See McCullough*, 559 F.3d at 1206. What happened to Mr. Davis was tragic and almost unimaginable, but we cannot say that the officers' conduct was unreasonable. Nor can we find any clearly established law that would have fairly put them on notice that they could not use deadly force.

## E.

Davis also asks us to sequentially sever the unfolding events by separating the officers' first round of shots from the final shot Waller fired at Davis when he opened the door and began to exit the truck. Davis claims that the final shot violated the Fourth and Fourteenth Amendments, even if the first thirty-five shots did not. Taken in a light most favorable to the non-moving party, the evidence establishes that as the driver's side door opened once the truck came to a stop, almost instantaneously, Waller fired a shot in the direction of the open door, striking Davis in the shoulder. We think Davis draws too fine a distinction. These chaotic and dangerous events unfolded simultaneously, and Waller's use of deadly force responded to the same continuous threat. Even though

Davis was driving, it does not follow inexorably that Davis would be the one exiting the driver's side door after several minutes of driving and gunfire. Arnold was hiding in the footwell of the truck and trying to operate the pedals while Davis was driving. It is entirely plausible that, after the tumult, Arnold ended up on that side of the truck and tried to escape through the closest door. If Waller, the officer with the worst vantage point, had waited for confirmation of Davis's identity before firing and it had turned out to be Arnold (armed with a long gun) who was exiting the cab, Waller's fellow officers would have been placed in life-threatening peril. "A police officer is entitled to continue his use of force until a suspect thought to be fully armed is 'fully secured.'" *See Jean-Baptiste*, 627 F.3d at 821–22 (11th Cir. 2010) (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009)).

Our concurring colleague emphasizes the decision of the other officers not to fire an additional shot and the less dangerous circumstances the officers supposedly faced once the truck came to a stop. We read this unusual record differently. For starters, we disagree that "the truck itself no longer posed a threat" once it came to a stop in the seconds before Davis jumped out. Concurrence at 6. As all agree, Arnold -- an armed and exceedingly dangerous felon with a demonstrated propensity for flight -- remained in the cab and could have put the truck back in motion at any moment. Nor is this a case where the exigent circumstances "vanished." Concurrence at 9. Davis's own deposition indicates that there was hardly any time between when the truck came to a stop

and when he "bailed out." Davis was asked, "[s]o you said that at one point you stop the truck and you bail out; right? . . . Tell me how you did that. Tell me what steps you went through." He said, "I just knocked it out of gear, went up there, cut it off. I bailed out." D.E. 36-7 at 76. Davis was also asked whether he said anything or stuck his hands out the window before he bailed out. He didn't; he only "held [his] hands up when [he came] out [of] the door." *Id.* Waller told a similar story, saying, "the vehicle stopped abruptly . . . the door burst open." D.E. 36-22 at 106. By all accounts, the truck stopped, the door burst open, and Waller fired his final shot in rapid succession with precious little time for studied reflection. The condensed timeline, along with the perilous circumstances, make it particularly difficult to separate this single scene into discrete "episode[s]."

We also question how useful "a barometer for reasonableness in this case is the conduct of the other officers at the scene." Concurrence at 6. More than one course of action can be reasonable -- the other officers' decision not to shoot does not render Waller's choice unreasonable. *See Vinyard*, 311 F.3d at 1346 ("An officer will be entitled to qualified immunity if his actions were objectively reasonable, that is if an objectively reasonable officer in the same situation could have believed that the force used was not excessive."). This is especially so considering the dissimilar positions of the officers on the scene. Waller was farthest away from the cab of the truck because the 18-wheeler had driven past him, and "was closer to where the other three officers were." D.E. 36-

22 at 103, 105–07. The other officers -- Browder, Drake, and Waldroup -- were clustered closer to the cab of the truck, and, notably, directly across from where the driver's side door burst open. As Browder put it, the truck stopped "as soon as it passed" him, and it was then "almost even with the two deputies that were behind" him. D.E. 36-6 at 143. In an instant, Waller determined that his colleagues were "where they could be shot, run over, whatever, or both." D.E. 36-22 at 108. It is little wonder, then, the other officers decided not to shoot; they were able to tell the man exiting the truck was Davis, not Arnold, before Waller was able to do so.

Finally, it is worth noting that Browder and Mathews thought the split-second decision to shoot or hold fire was a close one. Browder testified that, when the truck stopped, he'd "already raised [his] rifle up" and "had slack out of the trigger," but relaxed once he didn't see anything in Davis's hands. D.E. 36-6 at 143. Mathews, although he "couldn't acquire a target to shoot" at any point, said he "totally defend[s] the actions of the officers that shot . . . I totally feel that the truck was a hazard to the public with the suspect inside." D.E. 44 at 83. "Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer." *Carr*, 338 F.3d at 1270 (quotation marks omitted). We think Waller's split-second decision to fire a final shot was reasonable.

But even if we could break the fast-unfolding events sequentially into two discrete stages -- a proposition we reject on the facts as they've been presented -- because the final event unfolded so quickly, the officers' conduct still did not violate any clearly established law.  The cases cited by Davis all assume that the officer *knew* the plaintiff posed no danger.  The facts say otherwise here, and the problem for Davis is that we can find no clearly established law, even remotely similar, that would have given Officer Waller fair notice that it was unreasonable to use deadly force.

***

William Arnold put Donald Davis, the officers, and the public in grave and imminent danger.  Police officers like Browder and Waller may use deadly force to dispel a threat (and, here, an imminent one) of serious physical harm or death or to prevent the escape of a very dangerous suspect who threatens that harm. Browder and Waller made the difficult, but altogether reasonable, decision that Arnold and the logging truck had to be stopped -- and, tragically, that meant stopping Davis, too.

We **AFFIRM** the district court's entry of final summary judgment to Browder and Waller.

JILL PRYOR, Circuit Judge, Concurring:

I concur in almost all of the majority opinion, which thoughtfully analyzes the difficult issues in this tragic case. I write separately only to say that I would analyze defendant Paul Waller's final shot differently. Construing the facts of this case in the light most favorable to plaintiff Don Davis—a hostage who was shot as police tried to apprehend a violent suspect—I conclude that Waller's final shotgun blast violated Davis's constitutional right to be free from the unreasonable use of deadly force. Thus, I disagree with the majority's decision in Part II.E of the opinion that there was no constitutional violation. But I concur in Part II.E's conclusion that Waller did not violate any clearly established law and therefore was entitled to qualified immunity.

The majority opinion accurately recounts the facts of the case. The suspect, William Arnold, took his own grandmother hostage. He shot his pregnant girlfriend and threw her from his vehicle onto the road. She died from her injuries. While trying to escape, he got into a shootout with defendant Shaun Browder. After Arnold made his way on foot to a logging ground, he took Davis—a gentleman in his late 50s—hostage. At gunpoint, Arnold forced Davis to drive him out of the logging ground in a logging truck. As these events unfolded throughout the better part of a late morning and afternoon, the police received live updates over the radio.

Somehow, Davis found an opportunity to call 911. He informed the 911 operator that he had been taken hostage and was

21-11333            JILL PRYOR, J., Concurring                    2

being forced at gunpoint to drive Arnold in a logging truck. The
911 operator relayed this message to the police officers:

> I have a subject on the phone that is advising the sub-
> ject y'all are looking for is in the vehicle with him ad-
> vising if he does not go where he tells him to[,] he will
> kill him . . . They are in a logging truck.

Doc. 37-1 at 10.[1] Multiple officers admitted they heard the above
transmission and interpreted it to mean that Arnold had taken a
hostage and was forcing the hostage to drive in an apparent escape
attempt. *See, e.g.*, Doc. 41 at 127 (Browder Deposition) ("I believe
that's when it was relayed on the radio that [Arnold] had taken a
log truck driver hostage and had ordered him to drive the truck.");
Doc. 44 at 29, 48 (Mathews Deposition) (testifying that he heard
over the radio that "Arnold had commandeered a log truck . . . with
a hostage"); Doc. 49 at 65–66 (Waldroup Deposition) (testifying
that he heard the transmission that Arnold "had carjacked the log-
ging truck" and was aware the hostage could be driving); Doc. 44
at 32–33 (Tapley Deposition) (testifying that he heard the transmis-
sion that "Arnold had hijacked a timber truck with a hostage").
Given this evidence, we must therefore assume at summary judg-
ment that Waller, who testified that he was "definitely listening"

---

[1] "Doc." refers to docket entries in the district court record.

21-11333            JILL PRYOR, J., Concurring            3

to the radio in his car,[2] Doc. 50 at 72 (Waller Deposition), knew a hostage was driving Arnold in the logging truck.

Fast-forward to the moment when the logging truck began driving toward the officers. Let me set the scene[3]: the officers were on a dirt logging road, facing the logging truck which was about 80 yards away and coming down the road with a violent suspect in control. Several police vehicles were parked along both sides of the road, leaving a partially unobstructed path down the center of the road. Police officers were taking cover behind the vehicles. As the logging truck approached at a speed of 5-10 miles per hour, it hit Arnold's abandoned pickup truck, pushing it out of the way. The logging truck soon came upon the police officer's parked vehicles, and it sideswiped and knocked those vehicles out of the way as it continued to travel down the road. The officers moved backward as the truck approached, retreating from vehicle to vehicle for

_____

[2] Undisputed record evidence indicates that Waller was in his car and on his way to the scene when the transmission played over the radio. *See* Doc. 41-1 at 3 (Browder's Incident Report) (indicating that Waller was on his way to the scene when the radio transmission played); *see also* Doc. 41 at 127–28 (Browder Deposition) (testifying that Waller "showed up" to the scene after the radio transmission played); Doc. 50 at 81 (Waller Deposition) (Waller testifying that he "pulled up" to the scene in his vehicle "immediately" before the logging truck started driving towards the police, suggesting he was in his car in the moments before).

[3] To help visualize the scene described in this paragraph, I have included in the Appendix attached to this opinion photographs taken from the record. *See* Photo 1.

21-11333        JILL PRYOR, J., Concurring                    4

cover. Eventually, the officers found themselves on the right side of the road behind a police vehicle parked on that side. As the logging truck came upon that vehicle, one officer yelled something like, "someone put some rounds in that truck!" Doc. 56-1 ¶ 143 (internal quotation marks omitted). Multiple officers fired into the logging truck's driver's-side door at close range, riddling the cab with 35 bullets.[4] I have no doubt that Arnold was an extremely dangerous suspect whom the police officers were justified in using deadly force to stop.

After this initial volley of bullets, the logging truck continued to roll forward. It finally came to a stop as it collided with the final police vehicle on the left side of the road—Waller's black Dodge Charger. There was a brief pause, and then the driver's-side door of the logging truck opened and Davis—who had been shot eight times—exited the truck with his hands in the air. *See* Doc. 42 at 77 (Davis Deposition) ("I opened the door and got out . . . I held my hands up when I c[a]me out [of] the door."); *see also* Doc. 56-1 at 29 (Undisputed Facts) ("Davis jumped out of the log truck with his hands up.").

This is the critical moment: Waller testified that "the [driver's-side] door burst open," and he simply "shot towards [the] direction" of the opening door, firing a combat-loaded slug from his shotgun. Doc. 50 at 108 (Waller Deposition). The slug from

---

[4] *See* Photo 2 in Appendix.

21-11333          JILL PRYOR, J., Concurring          5

Waller's shotgun entered Davis's shoulder—the ninth time Davis had been shot that day. All the other officers held their fire.

In my view, Waller violated Davis's constitutional rights by using deadly force when it was no longer reasonable to do so. In asking whether the use of deadly force is reasonable, we must remember that "while the use of deadly force may initially be justified, the level of force that is reasonable may change during the course of a police encounter." *Hunter v. Leeds*, 941 F.3d 1265, 1280 (11th Cir. 2019). "Deadly force is reasonable . . . when an officer . . . has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ." *Id.* at 1279 (internal quotation marks omitted).

A barometer for reasonableness in this case is the conduct of the other officers at the scene. *See Johnson v. City of Miami Beach*, 18 F.4th 1267, 1272 (11th Cir. 2021) ("[W]e judge the officer's use of force . . . from the perspective of a reasonable officer on the scene . . . ."). After the police collectively fired 35 bullets into the logging truck, the truck rolled to a stop. At that point, the truck itself no longer posed a threat. Aware that a hostage was inside the truck and likely driving, no other police officer shot after the truck stopped. Scott Waldroup testified that he and other officers "just stopped [firing]" because "the truck had stopped[, and t]here was no reason to fire any more rounds into the truck till we could assess the situation." Doc. 49 at 111 (Waldroup Deposition). Andrew Drake, another officer, looked "for a weapon" in the driver's hands, did not see one, and did not shoot. Doc. 43 at 112, 114 (Drake

21-11333              JILL PRYOR, J., Concurring                    6

Deposition). Browder—who had been involved in a shootout with Arnold earlier that day—likewise testified that he let "slack out of the trigger" when Davis got out of the logging truck because he "didn't see anything in [Davis's] hands" and was able to tell it was "an older gentleman" getting out of the truck. Doc. 41 at 144 (Browder Deposition). Michael Mathews testified that he "had seen a hostage" in the logging truck, "couldn't acquire a target to shoot," and was "not going to recklessly shoot." Doc. 44 at 44, 84 (Mathews Deposition).

In contrast to every other officer on the scene, Waller shot. He did not acquire a target. He did not wait to see if the driver had anything in his hands. By his own admission, he simply reacted to the opening door, shooting in its direction. Taking the facts in the light most favorable to Davis, Waller fired his shotgun blindly at the person opening the door, knowing there was a substantial chance his bullet could hit a hostage. Is this a reasonable use of deadly force? I do not believe it is.

My concerns are two-fold. First, Waller risked harming a hostage presumably with the goal of protecting his fellow officers. The propriety of that choice implicates deep philosophical questions and has no easy answers. But Waller made that choice at a point when no other officer thought it was necessary to risk harming the hostage further, suggesting that the risk he took was no longer justified. Second—and perhaps more important given our standard that no reasonable officer in similar circumstances would have acted as the defendant did—I do not believe it was reasonable

21-11333            JILL PRYOR, J., Concurring            7

for a police officer in this circumstance to discharge a deadly weapon blindly. Sure, we could imagine fact-specific situations in which shooting blindly might be reasonable, but the situation here, where one of the two people who could possibly be coming out the door was known to be a hostage, does not strike me as one of those. Indeed, Mathews testified that he did not see a reason to shoot without acquiring a target, saying that doing so amounted to "reckless[] shoot[ing]." Doc. 44 at 84 (Mathews Deposition). Again, the uniform actions of every other officer at the scene serve as my guidepost for reasonableness—no one else thought it necessary to use deadly force at this point. Had Waller waited an instant longer, he would have seen Davis coming out with his hands in the air. And so, Waller's final shot constituted the unreasonable use of deadly force, and I would find a constitutional violation at this step of the qualified immunity analysis.[5]

Rather than confront the facts surrounding Waller's final shot, the majority opinion lumps all the circumstances of this case into a single episode of exigent circumstances. The majority opinion's tack shortchanges the important notion that the justification for deadly force—an extraordinary coercive power of the state—can vanish in an instant. *See Hunter*, 941 F.3d at 1280 (holding that

---

[5] When an action is within an officer's "discretionary authority," which is undisputed here, the officer will not enjoy qualified immunity if the plaintiff can demonstrate: (1) "that the [officer] violated the plaintiff's constitutional rights" and (2) "the law clearly established those rights at the time of the alleged misconduct." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013).

the justification for deadly force vanished during a shootout once the shooter dropped his gun).

Here, the record, viewed in Davis's favor, establishes that the justification for deadly force had disappeared by the time Waller fired his final shot. Recall Waldrop testified that, after the truck stopped, "[t]here was no reason to fire any more rounds into the truck till we could assess the situation." Doc. 49 at 111 (Waldroup Deposition). Browder and Drake likewise decided to stop shooting and focused their attention on Davis's hands as he exited the truck. *See, e.g.*, Doc. 41 at 144 (Browder Deposition); Doc. 43 at 112, 114 (Drake Deposition). The majority opinion fails to recognize this evidence and construe it in Davis's favor.

Instead, the majority opinion adopts Waller's proposed narrative that the "condensed timeline" prevented him from thinking before shooting. Majority Op. at 22. We do not know how much time passed after the logging truck stopped before Davis exited the truck. But Drake testified that there was "a brief moment where nothing happened" after the truck stopped before Davis got out. Doc. 43 at 112 (Drake Deposition). Even without knowing exactly how much time passed, however, we know that every other officer who initially fired on the truck had the time necessary to make the decision to stop shooting. The majority opinion fails to explain why

21-11333            Jill Pryor, J., Concurring            9

Waller, who was in the same situation as every other officer, lacked the opportunity to make the same decision.[6]

The majority opinion also defends Waller's final shot by saying, without a supporting citation, that Waller had the "worst vantage point." Majority Op. at 21. I am not sure this is true. Waller was in what he called "the safest spot"—behind the cab of the logging truck, next to its log bed, Doc. 50 at 103, 107–109 (Waller Deposition), whereas the other officers were positioned near the front of the truck. *See id.* I see no evidence in the record suggesting that Waller's line of sight was materially obstructed. His line of fire was clear. And because he was to the rear of the driver's side door, the door would not have obstructed his view as it was opening. Taking the facts in the light most favorable to Davis, Waller's vantage

---

[6] The majority opinion takes evidence out of context when it says that the decision not to shoot was "a close one" for the other officers. Majority Op. at 24. To support that proposition, the majority opinion first quotes Browder who said he had his "rifle up" and "had slack out of the trigger" when Davis exited the truck. Doc. 41 at 144 (Browder Deposition). Nothing about Browder's testimony, viewed in Davis's favor, suggests that Browder almost shot Davis as he exited the truck. Rather, Browder's testimony suggests that he readied himself to shoot as the door opened, but he resolved to ascertain the identity of the person exiting the truck before firing. The majority opinion also quotes Mathews, who said that he "totally defend[s] the actions of the officers that shot." Doc. 44 at 83 (Mathews Deposition). Mathews's statement expresses understandable loyalty to his fellow officers, but it does not speak to whether he almost shot Davis. It is also unclear whether Mathews meant to encompass Waller's final shot in his statement, or if he was speaking instead about the initial volley of 35 bullets "the officers" collectively fired before the truck stopped.

21-11333          JILL PRYOR, J., Concurring          10

point was immaterial: he simply reacted to the opening door, firing his shotgun without attempting to see who was exiting the logging truck or whether the person was armed.

Remarkably, the majority opinion "question[s]" whether the other officers' conduct serves as a helpful guide in defining the contours of reasonableness. Majority Op. at 23. In "determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene." *Terrell v. Smith*, 668 F.3d 1244, 1251 (11th Cir. 2012) (internal quotation marks omitted). While it is true that more than one course of action might be reasonable in each case, we have to start somewhere in deciding how an objectively reasonable officer would behave. Surely, the uniform actions of the other officers on the scene serve as a better measure of reasonableness than our after-the-fact musings about whether deadly force was still justified after the truck stopped advancing toward the officers.

Notwithstanding my disagreements with the majority opinion, I concur that Waller is entitled to qualified immunity because I am confident that the majority opinion reaches the correct result. We largely lack guidance in what constitutes reasonable use of deadly force when hostages or innocent bystanders are caught in the crossfire between the police and a gunman. Therefore, I cannot say that Waller violated any clearly established law by firing his weapon after his fellow officers stopped firing theirs. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts may resolve qualified immunity determinations on clearly established

21-11333                JILL PRYOR, J., Concurring                11

grounds alone). Having concluded that Waller violated Davis's constitutional rights by using deadly force unreasonably, I would resolve this case on the lack of clearly established law alone.

## Appendix

## Photo 1





P-01417

## Photo 2

