[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-10033

_____

IWOINAKEE GEBRAY HARRIS-BILLUPS,
Surviving Children of Decedent on behalf of
Quamere Jadon Harris
on behalf of Quamillieon Jaden Daniel
as administrator of the estate of Quintas Deshun Harris,

Plaintiff-Appellant,

*versus*

MILELE ANDERSON,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-03984-SCJ

_____

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

NEWSOM, Circuit Judge:

This is a tragic case, from beginning to end. It's tragic for Quintas Deshun Harris, a Navy veteran who, having fired on several police officers who sought to question him, was then killed in a hail of 58 bullets. It's tragic for Mr. Harris's grieving family—his mother and two children, who lost a son and father. And it's tragic for Milele Anderson—the officer who discharged the fatal shot and who now lives with the memories of Mr. Harris holding a gun to her head, the images of him shooting at one of her colleagues, and the reality that she took a life.

Out of the tragedy arises a legal issue that requires our decision: When Officer Anderson fired the bullet that killed Mr. Harris, did she effect an "unreasonable . . . seizure[]" within the meaning of the Fourth Amendment? We hold that she did not. Having reviewed the record—and, most importantly, having repeatedly reviewed the bodycam footage of the incident—we hold, to the contrary, that she acted reasonably. In the moments leading up to Officer Anderson's decision to take the final shot, Mr. Harris had accosted her and held a gun to her head, separately pointed his gun at her and her colleagues, barricaded himself in his car, and exchanged fire with the officers. Finally, in (literally) the split second before Officer Anderson pulled the trigger for the last time, Mr. Harris, who had been hit four times and had fallen to the

pavement, lurched violently.   Particularly given all that had preceded it, a prudent officer witnessing Mr. Harris's lurch could well have thought that he was gearing up for yet another attack. In those circumstances, it was reasonable—and thus lawful—for Officer Anderson to shoot when she did.  The Constitution didn't require her to wait.

**I**

If a picture is worth a thousand words, the video footage of the incident underlying this case is worth ten thousand.  Officer Anderson's chest-mounted camera captured the moments that immediately preceded the shot that killed Mr. Harris.  And we'll get there soon enough.  First, though, we recount the events that occurred before Officer Anderson activated her bodycam.

Around midnight on August 2, 2017, Officer Anderson pulled into an apartment complex in DeKalb County, Georgia, responding to a noise complaint.  Almost immediately, Mr. Harris—who was suffering psychosis and stammering about "death or dying"—accosted Officer Anderson and put a gun to her head.  Officer Anderson drew her sidearm and Mr. Harris backed off—only to point his gun at her partner.

Weapons drawn all around, a standoff ensued.  The officers ordered Mr. Harris to drop his gun.  But he kept it trained on them and a third officer who had arrived to provide backup.  Mr. Harris warned that he would kill them all—and he even put the gun to his own head, threatening to kill himself.  Several tense moments

22-10033                Opinion of the Court                        4

passed as the officers repeatedly implored Mr. Harris to stand down.  Their pleas went unheeded.

Still armed, Mr. Harris got into his parked car.  As he did, a gun fell to the ground.  Thinking that Mr. Harris was then unarmed, one of the officers holstered his weapon and announced that Harris had dropped his gun.  But the peace was false:  Mr. Harris promptly drew a second gun, and the standoff resumed.

It was at this point that Officer Anderson activated her bodycam.  The footage it captured is key to this case and is accessible      here.         *See*      Video,      Doc.      23-4 (https://www.ca11.uscourts.gov/media-sources).  Readers would do well to stop and watch it.  Here, in brief, is what it shows:

**0:00–1:10.**  As the camera begins to roll, Officer Anderson narrates, clearly on edge:  "Ass should have been fuckin' shot," she snaps.  *Id.* at 0:06–0:21.  She and her partners sternly—and repeatedly—order Mr. Harris to "put the weapon down!"  *Id.* Officer Anderson repositions herself to avoid crossfire and instructs the others to do likewise:  "Watch the crossfire!" she commands. *Id.* at 0:45; *see also id.* at 0:26–0:38.  She moves in front of Mr. Harris's car, eyeing him through the windshield.

**1:11–1:20.**  The dam breaks.  At the 1:11 mark, Mr. Harris opens fire on the officers.  They respond relentlessly, unleashing a five-second barrage of 54 bullets.  *Id.* at 1:12–1:17.  Mr. Harris emerges from the car, and Officer Anderson fires three more times. *Id.* at 1:17–1:20.  (Of these 57 bullets, four hit Mr. Harris—one each

in his abs, back, forearm, and calf.)  Mr. Harris falls to the pavement.

**1:21–1:24.**  At this point, Mr. Harris appears to have been disarmed—his first gun remains where he dropped it, several feet from where he lies, and the second is just next to it.  *See id.* at 1:39.[1] Even so, the situation remains extremely volatile.  One officer cries out that he's been "shot in the hand, shot in the hand!"  *Id.* at 1:21– 1:24.  (The bullet fragment, as it turns out, was from his own weapon.)  Officer Anderson keeps her gun trained on Mr. Harris, who is writhing on the pavement, in the fetal position, atop shards of glass.  *Id.* at 1:20–1:24.

This case turns on what happens during the next second.

**1:25–1:26.**  At the 1:25 mark, Harris lurches—violently.  *Id.* at 1:25.  His legs kick outward, his chest jumps off the ground, and his arms swing down to his torso.[2]  Immediately, Officer Anderson takes one more shot.  *Id.*  This bullet, the 58th fired at Mr. Harris, kills him.

## II

Acting as his estate's administrator and on behalf of his two sons, Mr. Harris's mother, Ms. Iwoinakee Harris-Billups, filed suit

---

[1] This freeze-frame image comes from the moment just after the 58th and final shot, but depicts the guns' locations.

[2] The lurch lasts only a split second.  To see it more clearly, viewers should reduce the video's speed and turn up their screen's brightness.

against Officer Anderson.  Ms. Harris-Billups principally sought damages under 42 U.S.C. § 1983,[3] alleging that Officer Anderson had used constitutionally excessive force—and had thereby "unreasonabl[y] . . . seiz[ed]" Mr. Harris in violation of the Fourth Amendment—when she fired the 58th and fatal bullet.  She also appended two Georgia-law claims: one for assault and battery, *see* Ga. Code Ann. §§ 51-1-13, 51-1-14 (West 2022), and another for wrongful death, *see id.* § 51-4-2.

Officer Anderson moved for summary judgment.  She argued that qualified immunity shielded her from suit on the § 1983 claim and that official immunity protected her from the state-law claims.

The district court granted Officer Anderson's motion.  It first agreed that qualified immunity knocked out Ms. Harris-Billups's § 1983 claim.  In particular, it held that Officer Anderson's "split-second" decision to fire the fatal bullet didn't violate the Fourth Amendment: It was "objectively reasonable," the court concluded, "for [Officer Anderson] to believe that [Mr. Harris] still posed a threat at the time of the final shot."  Because that holding alone warranted granting Officer Anderson summary judgment, the

---

[3] In relevant part:  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."  42 U.S.C. § 1983.

court found no need to assess the second prong of the qualified-immunity analysis: whether Officer Anderson's actions had violated "clearly established" law.

Having rejected Ms. Harris-Billups's federal constitutional claim, the district court refused to consider her state-law claims. For support, the court cited 28 U.S.C. § 1367(c), which permits a district court to "decline to exercise supplemental jurisdiction over a claim" if it has "dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

This is Ms. Harris-Billups's appeal.[4]

### III

A government official exercising discretionary authority—as all agree Officer Anderson was—is entitled to qualified immunity on a plaintiff's § 1983 claim unless (1) she "violated one or more constitutional rights" and (2) "it was clearly established at the time that [her] specific actions did so."  *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022).  Like the district court, we conclude that this case can be decided at the first step of the qualified-immunity analysis.  For reasons we will explain, we hold that Officer

---

[4] We review de novo whether the district court was correct to award Officer Anderson qualified immunity, *see Dukes v. Deaton*, 852 F.3d 1035, 1041 (11th Cir. 2017), and we review for abuse of discretion the court's decision to decline supplemental jurisdiction, *see Raney v. Allstate Ins.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004).

Anderson did not violate the Fourth Amendment when she shot and killed Mr. Harris.

## A

The Fourth Amendment forbids law-enforcement officers from making "unreasonable . . . seizures." U.S. Const. amend. IV. "[T]here can be no question that apprehension [of a suspect] by the use of deadly force is a seizure . . . ." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). So Officer Anderson's conduct here—shooting and killing Mr. Harris—is "subject to the reasonableness requirement of the Fourth Amendment." *Id.*

In many cases, a claim that a seizure was unreasonable would force us to "slosh our way through the factbound morass of" the "reasonableness" analysis. *Scott v. Harris*, 550 U.S. 372, 383 (2007). Here, though, a bright(ish) line emerges: "[A]n officer may use deadly force when [s]he 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' . . . ." *Powell*, 25 F.4th at 922 (internal punctuation omitted) (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003)). Probable cause, in turn, exists when the "facts and circumstances [are] sufficient to warrant a prudent" officer in reaching that conclusion. *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016) (defining "probable cause"). And to be clear, the inquiry is an objective one—the question isn't whether Officer Anderson herself actually believed that the circumstances justified the use of deadly force, but rather whether a reasonable officer in her position could have so concluded. *See Graham v. Connor*, 490

U.S. 386, 397 (1989). "Probable cause," the Supreme Court has emphasized, "is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).

Several important facts would have justified a reasonable officer in believing that Mr. Harris posed a lethal threat at the time Officer Anderson fired the fatal shot. First, Mr. Harris had access to at least two guns. True, they weren't within his immediate reach, but they weren't far beyond it. *See* Video at 1:39. With a quick lunge, he probably could have reached them. And remember, just minutes earlier, Mr. Harris, having dropped one gun, had surprised the officers with a second. Accordingly, Officer Anderson could reasonably have feared that he had yet another gun at the ready. In any event, Mr. Harris's access to deadly weapons supports a reasonable conclusion that he posed a deadly threat. *Cf. Davis v. Waller*, 44 F.4th 1305, 1314 (11th Cir. 2022) ("[W]e have consistently said that it is reasonable for an officer to believe that a suspect poses an 'immediate risk of serious harm to [him]' when the suspect is armed."); *Powell*, 25 F.4th at 922 ("[W]hen a suspect's gun is available for ready use—even when the suspect has not drawn his gun—an officer is not required to wait and hope for the best.") (internal quotations omitted).

Second, Mr. Harris had proven his willingness to *use* those guns against the officers. By the time Officer Anderson fired the final shot, Mr. Harris had (1) held a gun to Officer Anderson's head, (2) pointed a gun at other officers, (3) ignored the officers' repeated orders to "put the weapon down," and, finally, (4) engaged in an

active firefight. Lest there be any doubt, anyone who uses or threatens to use a deadly weapon in the way that Mr. Harris did "poses a threat of serious physical harm." *Powell*, 25 F.4th at 922; *see also Davis*, 44 F.4th at 1314 (canvassing decisions authorizing police officers' use of deadly force against drivers who use or threaten to use their cars as weapons).

Third, Mr. Harris was acting erratically and displaying a frighteningly "unstable frame of mind." *Long v. Slaton*, 508 F.3d 576, 581–82 (11th Cir. 2007) (confirming that a suspect's "unstable frame of mind" can support probable cause to use deadly force). Not only had he committed dangerous "criminal act[s]," he had also "energetic[ally] eva[ded]" the officers by barricading himself in his car and ignoring more than a dozen orders to surrender. *Id.*

Against that backdrop, a reasonable officer could certainly have interpreted Mr. Harris's sudden lurch as the commencement of yet another attack. As we have explained—and as the bodycam video confirms—Mr. Harris's lurch was not the staggering, slow-to-get-up tossing of a dazed or injured athlete. It was the jolt of one jarred awake or springing into sudden, urgent action. In the blink of an eye, Mr. Harris's upper body rose off the ground, his legs kicked, and his arms swooped down toward his torso. Could he have been working up the momentum to stand or slide toward one of the guns on the ground? Might he have been reaching for a third

gun in his pants? Or was he instead just writhing in pain?[5] We can't be sure *what* Mr. Harris was doing. And that is precisely the point: "[A]n officer is not required to wait until an armed and dangerous felon has drawn a bead on [her] or others before using deadly force." *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997); *cf. also Long*, 508 F.3d at 581–82 (upholding as reasonable an officer's use of deadly force against a mentally unstable individual who had stolen a police cruiser, even though he hadn't yet driven it dangerously); *Mullenix v. Luna*, 577 U.S. 7, 17–18 (2015) (endorsing *Long*).

★   ★   ★

Bottom line: Officer Anderson was facing down a man who had been threatening to kill her for several minutes straight. He had held a gun to her head, separately pointed his gun at her and her partners, spurned repeated orders to drop his weapons and surrender, barricaded himself in his car, and, finally, opened fire. This man knew how to conceal guns; he was suicidal, dogged, and erratic; and he had shown no signs of backing down. And with the

---

[5] Ms. Harris-Billups insists that, viewing the evidence in the light most favorable to her and drawing all reasonable inferences in her favor—as we must on summary judgment—we have to assume that Mr. Harris's lurch was "due to the pain that he [wa]s experiencing." Br. of Appellant at 21. The point, though, as explained in text, is that the *actual* reason for Mr. Harris's lurch—whether he meant to fight, stand up, or grab a gun, or was instead just experiencing pain—doesn't control our analysis; rather, what matters is that a reasonable officer couldn't have excluded any of these possibilities, and thus *could* have viewed Mr. Harris's lurch as threatening.

lurch, he seemed to be springing back into action. We have little trouble concluding that, in those circumstances, Officer Anderson could reasonably have believed that he posed a lethal threat. Her decision to neutralize that threat was "[ ]reasonable" and therefore constitutional.

## B

Ms. Harris-Billups raises several counterarguments. With respect, none persuades us.

First, Ms. Harris-Billups asserts that a comparison of two freeze-frame photos from the beginning and end of Mr. Harris's lurch proves that the movement couldn't "reasonably be construed as potentially threatening," Br. of Appellant at 28—because, she says, the two stills "show[ ] that Mr. Harris's only movement at this time was going from laying on his right shoulder and right leg with his legs curled and left leg bent in the air and hands to his head to a new position in which his right shoulder remained on the ground, his right leg remained on the ground, his head became raised and his arms were curled with his hands near his abdominal area," *id.* at 8. But policing doesn't occur in freeze-frames. It's not just the positioning of Mr. Harris's body parts that would have justified a reasonable officer in thinking his lurch threatening, but also the suddenness with which he began to shift from a prone, unmenacing posture to a potentially violent one. The video captures that suddenness in a way the freeze-frame images miss.

Second, Ms. Harris-Billups asserts that Officer Anderson's failure to take cover between the initial 57-bullet blast and Mr. Harris's lurch proves that she no longer viewed him as a threat. We disagree for two reasons. As an initial matter, Officer Anderson's private, subjective thoughts are irrelevant. The "reasonableness inquiry in an excessive force case is an objective one" that doesn't turn on an individual officer's "underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal quotation omitted).[6] Moreover, and in any event, the fact that Officer Anderson felt comfortable not taking cover *before* Mr. Harris suddenly lurched says little about how she (or a reasonable officer) would have felt *after* he did so. A reasonable officer could very well have thought that the lurch fundamentally altered the complexion of the situation.

Third, Ms. Harris-Billups asserts (quoting her expert) that Officer Anderson had no cause to shoot Mr. Harris because she had plenty of "time to fully assess the fact that the threat was alleviated and Mr. Harris was 'defeated by gunfire, had no weapon in his hand, [was] wounded and laying huddled on the ground.'" Br. of Appellant at 30 (quoting Doc. 26-4 at 9). That was all true—right up until it wasn't. Indeed, Officer Anderson presumably *did*

---

[6] That settled legal principle likewise defeats Ms. Harris-Billups's accusation that Officer Anderson "offered an excuse" for shooting Mr. Harris "that is not supported by the facts." Br. of Appellant at 31–32. Again, all that matters—at least for Fourth Amendment purposes—is that a reasonable officer in Officer Anderson's shoes could have believed that the use of deadly force was justified.

conclude that Mr. Harris wasn't dangerous when he was "lying huddled on the ground." And that likely explains why she didn't shoot him while he was lying huddled on the ground. In any event, we needn't address whether Officer Anderson would have been justified in firing once more had Mr. Harris *not* suddenly lurched. Because he did. And that lurch changed things. At the very least, having witnessed Mr. Harris lurch, a reasonable officer could have concluded that he was once again on the move, and once again posed a threat.

Fourth, Ms. Harris-Billups emphasizes that Officer Anderson was the only officer who shot Mr. Harris when he lurched; that fact, she says, shows "that Mr. Harris was no longer a threat." *Id.* At most, though, this suggests that Officer Anderson's colleagues didn't themselves believe that Mr. Harris posed a threat. But even indulging that assumption, those officers' subjective opinions wouldn't render a third officer's contrary judgment— especially one formed in (literally) a split second—disqualifyingly unreasonable. *See Davis*, 44 F.4th at 1318 (observing that "other officers' decision not to shoot does not render [the defendant officer's] choice [to shoot] unreasonable" because "[m]ore than one course of action can be reasonable").[7]

---

[7] In any event, as this Court recently explained in another case, the assumption that underlies Ms. Harris-Billups's contention is dubious. Just because other officers held their fire doesn't mean they thought Mr. Harris was benign. One of them had been shot in the hand and might have been unable to discharge his weapon. And another was on the other side of Mr. Harris's car and might

Finally, Ms. Harris-Billups contends that Officer Anderson is just like the policeman to whom we denied qualified immunity in *Hunter v. City of Leeds*, 941 F.3d 1265 (11th Cir. 2019). We disagree. The officer there had fired "seven additional shots against a suspect who . . . had dropped his weapon" in compliance with police directives "and was apparently no longer resisting." *Id.* at 1280. That's not this case. Officer Anderson wasn't contending with a defenseless man who had surrendered. She was up against a man who (or so a reasonable officer could have concluded) bore the means, and the ability, and the demonstrated intent to shoot her, a man who was acting erratically and violently, and who had shown no sign of giving up. Quite unlike the suspect in *Hunter*, Mr. Harris posed a real and immediate threat of grave harm.

⋆　⋆　⋆

For all these reasons, we hold that in firing the shot that tragically killed Mr. Harris, Officer Anderson did not violate the Fourth Amendment. Accordingly, she is entitled to qualified immunity on Ms. Harris-Billups's § 1983 claim.

## V

Once it had dismissed the § 1983 claim—the sole claim over which it had original jurisdiction—the district court was well

---

not have seen the lurch. *See Davis*, 44 F.4th at 1318 (noting that "other officers' decision not to shoot" is "especially" weak evidence that it was unreasonable to shoot if the various officers are in "dissimilar positions . . . on the scene").

within its discretion to decline to exercise supplemental jurisdiction over Ms. Harris-Billups's state-law claims.  Indeed, a federal statute authorizes district courts to do just that.  *See* 28 U.S.C. § 1367(c)(3).  And we have gone even further, "encourag[ing]" district courts to "dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney*, 370 F.3d at 1088–89.  A district court doesn't abuse its discretion by heeding our advice.

**AFFIRMED.**